EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.* RAFAEL A. BURGOS FUENTES, acusado y apelante. EL MISMO, demandante y apelado, *v.* EDUARDO LÓPEZ VÁZQUEZ, conocido por EDDIE LÓPEZ VÁZQUEZ, acusado y apelante.

Números 15299 y 15300.

*Sometidos:* 18 de diciembre de 1952. *Resueltos:* 22 de diciembre de 1953.

*F. Hernández Vargas* y *J. Hernández Vallé,* abogados de los apelantes; *Hon. Secretario de Justicia José Trías Monge* y *J. Rivera Barreras, Fiscal del Tribunal Supremo,* abogados de El Pueblo, apelado.

EL JUEZ ASOCIADO SEÑOR PÉREZ PIMENTEL emitió la opinión del tribunal.

Contra los apelantes Rafael A. Burgos Fuentes y Eduardo López Vázquez se radicaron sendas acusaciones ante el antiguo Tribunal de Distrito de Puerto Rico, Sección de Guayama, por infracción a las disposiciones de la Ley núm. 53 aprobada en 10 de junio de 1948 ((2) pág. 171), según ha sido enmendada. A Burgos Fuentes se le imputaron cinco cargos y dos a López Vázquez. Las acusaciones son similares y los cargos están redactados prácticamente en forma idéntica a excepción del sitio y fecha donde se alega ocurrieron los hechos. Para

comprender la naturaleza de estos cargos bastará leer el primero de los formulados contra Burgos Fuentes, que se copia a continuación:

### "Cargo Número Uno

"El referido acusado Rafael A. Burgos Fuentes, en o alrededor del día 25 de julio de 1948 y en la municipalidad de Cayey, Puerto Rico, ilegal, maliciosa, criminal y voluntariamente y a sabiendas, siendo un líder y miembro activo de la agrupación denominada 'Partido Nacionalista de Puerto Rico' dirigida y compuesta de personas que fomentaban, abogaban, aconsejaban y predicaban y fomentan, abogan, aconsejan y predican el derrocamiento, la paralización y la destrucción del Gobierno Insular de Puerto Rico y de sus subdivisiones políticas por medio de la fuerza y de la violencia, allí y entonces el referido acusado organizó y ayudó a organizar un grupo y asamblea de personas que fomentaban, abogaban, aconsejaban y predicaban el derrocamiento, la paralización y destrucción del Gobierno Insular de Puerto Rico y de las subdivisiones políticas de éste por medio de la fuerza y de la violencia, consistente dicha ayuda en que el referido acusado Rafael A. Burgos Fuentes, organizó y reunió en dicha municipalidad de Cayey y condujo desde allí hasta la municipalidad de Guánica un grupo de personas pertenecientes al llamado 'Ejército Libertador' o 'Cadetes de la República', entidad ésta de carácter militar creada, organizada y compuesta por dirigentes y miembros de la agrupación denominada 'Partido Nacionalista de Puerto Rico' y adscrita y perteneciente a dicha agrupación, para participar como participó el referido grupo de personas en una asamblea y otros actos celebrados ese día en dicha municipalidad de Guánica por la agrupación denominada 'Partido Nacionalista de Puerto Rico'; todo ello realizado por el acusado mencionado como parte de un movimiento separatista impulsado por el aquí acusado y Tomás López de Victoria, Virgilio Mercado, Heriberto Castro, José Antonio Negrón Rodríguez, Ramón Pedrosa Rivera y otras personas pertenecientes todos a la llamada agrupación 'Partido Nacionalista de Puerto Rico' encaminado dicho movimiento a conseguir la separación de Puerto Rico de los Estados Unidos por medio de la fuerza y la violencia, movimiento que culminó en una revuelta que comenzó en Puerto Rico en o alrededor del día 30 de octubre de 1950."

Los acusados solicitaron en el tribunal a quo la desestimación y archivo de las acusaciones por varios fundamentos que más adelante discutiremos. Su solicitud fué declarada sin lugar. En las fechas señaladas para las vistas de los casos, los acusados renunciaron al jurado y se sometieron a juicio por tribunal de derecho. Reiteraron entonces su solicitud para que se desestimaran las acusaciones fundándose en que la corte carecía de jurisdicción y en que la Ley núm. 53 de 1948, que se alegaba haber sido infringida, era inconstitucional. Al ser rechazada esa contención, la defensa aceptó que de declarar los testigos de El Pueblo, sostendrían las alegaciones de las acusaciones, renunciando a presentar prueba. En estas circunstancias la corte procedió a declarar culpables a los acusados y sentenció a Burgos Fuentes a cumplir de uno a cinco años de presidio en cada uno de los cargos y a López Vázquez a cumplir de uno a quince meses de presidio en cada cargo, sentencias éstas para ser cumplidas concurrentemente con cualquier otra pena de presidio que hubiere sido dictada contra los acusados. No conformes éstos con dichas sentencias apelaron para ante esta Corte, y como en ambos recursos se plantean las mismas cuestiones, ordenamos su consolidación.

Los apelantes imputan a la corte a quo la comisión del siguiente

"Unico Error

"Cometió grave error de derecho el Hon. Tribunal inferior al no ordenar el archivo y sobreseimiento definitivo de estas causas criminales, absolviendo libremente a los acusados, al declarar sin lugar las siguientes cuestiones de derecho:

"1. La Ley número 53 de 10 de junio de 1948 es inexistente en derecho.

"2. La Ley número 53 de 10 de junio de 1948 es anticonstitucional; siendo inconstitucional por sí mismo, independientemente del resto de dicha Ley, el inciso tercero del artículo primero de la misma.

"3. La Ley número 53 de 10 de junio de 1948 es inaplicable al caso de los acusados-apelantes, careciendo de jurisdicción los tribunales insulares.

"4. El delito concebido en la Ley número 53 de 10 de junio de 1948, es de naturaleza continua; todos los actos alegadamente realizados en contravención de dicha Ley constituyen una sola transacción y un solo delito; y ya los acusados fueron juzgados y convictos ante la Sección de San Juan del mismo Tribunal de Distrito de Puerto Rico, por el mismo alegado delito; (*jeopardy*)."

■ El primer fundamento del error señalado carece de mérito. Sostienen los apelantes que la Ley núm. 53 de 10 de junio de 1948 (¹) castiga la comisión de determinados actos tendentes a derrocar, paralizar o destruir el "gobierno insular", o cualquier subdivisión política de éste, siendo lo cierto que al aprobarse dicha ley por nuestra Asamblea Legislativa no existía jurídica y políticamente hablando gobierno alguno conocido por "Gobierno Insular" ya que cuando el Congreso de Estados Unidos aprobó la Ley Foraker en 1900 y luego la Ley Jones en 1917, creó un cuerpo político-jurídico denominado "El Pueblo de Puerto Rico" y en ambos estatutos se dispone que el gobierno de "El Pueblo de Puerto Rico" se llamará "El Gobierno de Puerto Rico". Arguyen además que al aprobar la Ley núm. 53, la "Legislatura de Puerto Rico quiso proteger de la propaganda y actividades subversivas al 'Gobierno In-

---

(¹) Dicha Ley dispone que constituirá delito grave (*felony*) la comisión por cualquier persona de cualquiera de los siguientes actos:

"1. fomentar, abogar, aconsejar o predicar, voluntariamente o a sabiendas la necesidad, deseabilidad o conveniencia de derrocar, paralizar o destruir el gobierno insular, o cualquier subdivisión política de éste, por medio de la fuerza o la violencia;

"2. imprimir, publicar, editar, circular, vender, distribuir o públicamente exhibir, con la intención de derrocar, paralizar o destruir el Gobierno Insular o cualquiera de sus divisiones políticas, cualquier escrito o publicación donde se fomente, abogue, aconseje o predique la necesidad, deseabilidad o conveniencia de derrocar, paralizar o destruir el Gobierno Insular o cualquier subdivisión política de éste, por medio de la fuerza o la violencia;

"3. organizar o ayudar a organizar cualquier sociedad, grupo o asamblea de personas que fomenten, aboguen, aconsejen o prediquen la derrocación o destrucción del gobierno insular, o de cualquier subdivisión política de éste, por medio de la fuerza o la violencia."

sular', gobierno de una Isla, que no sabemos cual isla era, . . ." Concluyen, por tanto, que la Ley núm. 53, no tiene existencia en derecho.

En primer término, es de notarse que en la propia Carta Orgánica invocada por los apelantes se denomina también al "Gobierno de Puerto Rico" con los nombres de "gobierno insular" [2] y "Gobierno Insular de Puerto Rico" [3]. En el mismo estatuto se le llama al Tesoro de Puerto Rico, "Tesoro Insular" [4]. Y en leyes posteriores, como por ejemplo la aprobada en 4 de marzo de 1931 "Para Coordinar el Trabajo de Estaciones Agrícolas Experimentales y Extender los Beneficios de Ciertas Leyes del Congreso al Territorio de Puerto Rico" [5], el Congreso de Estados Unidos hace referencia al "gobierno insular" y no al "Gobierno de Puerto Rico". No podría argüirse válidamente que en esa ley el Congreso legisló para el gobierno de cualquier Isla. Este mismo Tribunal se ha referido al "Gobierno de Puerto Rico" y al "Gobierno Insular" como sinónimos. *Pueblo ex rel. Castro* v. *Padrón Rivera*, 60 D.P.R. 798, 807.

Cuando el Congreso creó el cuerpo político jurídico "El Pueblo de Puerto Rico" con su Gobierno de Puerto Rico, dispuso que los poderes legislativos locales de ese gobierno residirían en "La Asamblea Legislativa de Puerto Rico". En esa forma se proveyó una autoridad legislativa por delegación del Congreso y con determinadas limitaciones. Sería absurdo pensar que esa autoridad legislativa tuviera facultades para legislar, como en el caso de la Ley núm. 53, para proteger otro gobierno que no sea el de Puerto Rico, llámesele a éste en el texto de la ley *gobierno insular*, o de cualquier otro modo. Aún en el caso de un Estado Soberano, éstos no pueden castigar delitos cometidos contra otras soberanías, ni puede dársele fuerza extraterritorial a las leyes penales. *The Antelope*,

---

[2] Artículo 3 de la Carta Orgánica (Ley Jones de 1917).

[3] Artículo 52 del mismo estatuto.

[4] Artículos 34 y 50 de la Carta Orgánica.

[5] U. S. Statutes at Large, Vol. 46, 1929-31, capítulo 494, pág. 1520.

10 Wheat (U.S.) 66, 123; *Huntington* v. *Attrill*, 146 U. S. 657, 669; *State* v. *Volpe*, 155 Atl. 223; *People* v. *MacDonald*, 24 C.A.2d 702, 76 P.2d 121. En consecuencia de lo expuesto rechazamos la contención de los apelantes al efecto de que la Ley núm. 53, no tiene existencia en derecho. Esto nos lleva a considerar los fundamentos segundo y tercero del error imputado a la corte a quo.

## Constitucionalidad de la Ley núm. 53 y Jurisdicción de los Tribunales Insulares para Entender en el Caso de los Acusados–Apelantes

Los apelantes sostienen (1) que la Legislatura de Puerto Rico carecía de facultades para aprobar la Ley núm. 53, y (2) que el campo cubierto por dicha ley había sido ya cubierto por el Congreso de los Estados Unidos al aprobar en 28 de junio de 1940 el *Alien Registration Act* conocida como la Ley Smith, estatuto este que excluye la aplicación en Puerto Rico de la susodicha Ley núm. 53.

En apoyo de estas dos proposiciones argumentan que la Ley núm. 53 es una medida adoptada por el Gobierno de Puerto Rico para evitar una rebelión, que es materia de soberanía; que nuestra Legislatura carece de facultades, por no habérsela delegado el Congreso americano, para legislar sobre materia de soberanía; que tanto la Ley Foraker como la Ley Jones depositaron en el Ejecutivo deberes que cumplir en casos de insurrección; (6) que Puerto Rico carece en absoluto de atributos de soberanía y que la única soberanía que aquí existe es la soberanía de Estados Unidos, cuya defensa está

---

(6) Los apelantes se refieren a las disposiciones de los Artículos 2 y 12 de la Carta Orgánica (Ley Jones) de 1917. Por el primero de ellos se concede facultad al Gobernador de Puerto Rico para suspender el auto de *hábeas corpus* en caso de rebelión, insurrección o invasión si así lo requiere la seguridad pública y por el segundo se le faculta para requerir a los jefes de las fuerzas militares o navales de Estados Unidos en Puerto Rico, o convocar el *posse comitatus*, o llamar la milicia para evitar o suprimir violencias ilegales, invasión, insurrección o rebelión, o poner la isla o cualquier parte de ella bajo la ley marcial hasta que pueda comunicarse con el Presidente y conocerse su decisión en el asunto.

reservada exclusivamente al Gobierno Federal. Afirman además que "No apareciendo en forma alguna que la Legislatura de Puerto Rico esté facultada para legislar protegiendo la soberanía de Estados Unidos en Puerto Rico, ni para condicionar o eliminar tal soberanía, resulta meridianamente claro que la Ley 53 de 1948, que castiga el derrocamiento del Gobierno Insular por medio de la fuerza y la violencia es anticonstitucional." Por otro lado sostienen que habiéndoseles imputado un delito federal—violación de la Ley Smith—los tribunales insulares carecen de jurisdicción para entender en el caso.

Están equivocados los apelantes. Si bien Puerto Rico no gozaba de soberanía externa bajo las Leyes Foraker y Jones y los poderes y facultades de su gobierno emanaban de la única soberanía aquí existente, la de los Estados Unidos, [7] ello no implica que el Gobierno de Puerto Rico careciera por completo de los atributos de un gobierno soberano, por lo menos en lo que respecta a asuntos de naturaleza local. [8] Ya en el año 1913 el Tribunal Supremo Nacional había resuelto que el gobierno establecido por la Ley Foraker no quedaba fuera de la regla general eximiendo *a un gobierno soberano en sus atributos* de ser demandado sin su consentimiento. *Puerto Rico* v. *Rosaly y Castillo*, 227 U. S. 270, 57 L. ed. 507. Véase también, *Richmond* v. *People of Puerto Rico*, 99 N.Y.S. 743. En *Gromer* v. *Standard Dredging Co.*, 224 U. S. 362–370, el mismo tribunal reconoció que el propósito de la Ley Foraker fué conceder a Puerto Rico un gobierno local propio confiriéndole una autonomía similar a la de los Estados de la Unión, y en *Puerto Rico* v. *Shell Co.*, 302 U. S. 253, adoptando el lenguaje de un caso estadual reconoció, a la página 267, la existencia de una soberanía territorial. En igual sentido se

---

[7] *Flores* v. *Alvarado, Jefe Penitenciaría*, 64 D.P.R. 893; *Puerto Rico* v. *Shell Co.*, 302 U. S. 253.

[8] En estos recursos no está envuelta cuestión alguna relacionada con el nuevo status de la isla bajo la Constitución del Estado Libre Asociado de Puerto Rico. Únicamente se discuten los poderes y atributos del Gobierno de Puerto Rico bajo el régimen de la anterior Carta Orgánica.

pronuncian las decisiones de la Corte de Apelaciones para el Primer Circuito. Bajo los amplios poderes generales conferidos por la Ley Orgánica de 1917 "Puerto Rico es ahora soberano", *Camuñas* v. *Puerto Rico Railway, Light & Power Co.*, 272 Fed. 924. En el ejercicio del poder de policía, Puerto Rico posee todos los poderes soberanos de un estado y cualquier ejercicio de ese poder que fuese razonable y se ejerciere para la salud, seguridad, moral o bienestar general no está en contravención con la Ley Orgánica ni con ninguna disposición de la Constitución federal, estando universalmente reconocido el poder de la Legislatura para regular, restringir y prohibir aquello que fuese injurioso al bienestar general. *González* v. *People of Puerto Rico*, 51 F.2d 61; *Armstrong* v. *Goyco*, 29 F.2d 900. El propósito tanto de la Ley Foraker como de la Ley Jones fué el de conferirle soberanía a Puerto Rico a la vez que una autonomía similar a la de los Estados. *Puerto Rico Tax Appeal*, 16 F.2d 545.[9]

Como parte de sus atributos soberanos, un estado puede, bajo el poder de policía, castigar el abuso de la libertad de palabra cuando la prédica tiende a corromper la moral pública, incitar al crimen o perturbar la paz pública. *Gitlow* v. *New York*, 268 U. S. 652; *Roberston* v. *Valdwin*, 165 U. S. 275, 281; *Patterson* v. *Colorado*, 205 U. S. 454–462; *Turner* v. *Williams*, 194 U. S. 279. ¿Estaba entre los atributos de cuasisoberanía concedido a Puerto Rico la facultad de nuestra Legislatura para aprobar una ley, en el ejercicio del poder de policía, castigando como un delito la prédica subversiva? La contestación a esta pregunta se reduce a determinar (1) si tal legislación cubre un asunto de carácter local y (2) si no la prohibe alguna ley federal o está en conflicto sustancial con ésta, o viola la política pública del Congreso expresada en alguna ley.

---

[9] Dicho caso fué revocado por otros motivos en *Smallwood* v. *Gallardo*, 275 U. S. 56.

En Puerto Rico existían, como cuestión de realidad, dos gobiernos, el Federal y el Insular o Gobierno de Puerto Rico. Si según hemos visto éste último tenía, como atributos de su soberanía territorial, la inmunidad contra pleitos, *Puerto Rico* v. *Rosaly y Castillo*, supra; el poder de aprobar una ley prohibiendo el tráfico de ciertos elementos no obstante existir una ley federal de drogas, *González* v. *People of Puerto Rico*, supra; el poder de aprobar una ley local contra monopolios, *Puerto Rico* v. *Shell Co.*, supra; el de poner en vigor, fijando penalidades, la política del Congreso sobre la tenencia de tierras, *Puerto Rico* v. *Rubert Co.*, 309 U. S. 543; el de reglamentar el tráfico de licores intoxicantes, *Bacardí Corporation* v. *Domenech*, 311 U. S. 150–167, tenemos que concluir que debería tener y que en efecto tenía el más importante poder de proteger su propia existencia prohibiendo y castigando aquellos actos que se realicen con el propósito de lograr su derrocamiento o destrucción por medio de la fuerza y la violencia. No podemos atribuir al Congreso la intención de crear en Puerto Rico un gobierno local sin los poderes inherentes o implícitos que tiene todo gobierno para proteger su propia existencia y que son atributos esenciales al ejercicio de sus funciones. Por tanto carece de persuasión el argumento, que ahora rechazamos, de que la Ley núm. 53 no cubre un asunto de naturaleza local. El propósito obvio de la Ley núm. 53 es el de proteger el gobierno constituído en Puerto Rico contra cambios que se pretendan realizar, no por medios pacíficos, legales y constitucionales, sino por medio de la violencia, la revolución o el terrorismo. *Dennis* v. *United States*, 341 U. S. 494. Dicha ley no define y castiga como delito, según parece ser el criterio de los apelantes, los actos en sí de violencia, revolución o terrorismo sino que más bien condena aquella conducta anterior, preparatoria y propicia para la realización de dichos actos. De ahí que la Ley núm. 53 no interfiera en absoluto, ni tenga relación alguna, con las facultades concedidas al Ejecutivo por la Carta Orgánica en caso de que ocurra una rebelión, insurrección o invasión.

 El hecho de que los actos prohibidos por la Ley núm. 53 estén también prohibidos por la Ley Federal (Ley Smith) no conlleva la invalidez de dicha Ley núm. 53. En el ya citado caso de *Puerto Rico* v. *Shell Co.*, supra, se discutió la validez de la Ley local contra monopolios en relación con la Ley Sherman. El Tribunal Supremo de Estados Unidos reconoció (páginas 259, 260) que el acto por el cual se acusaba bajo el estatuto local era el mismo acto que prohibía la Ley Federal y que en cada caso la ofensa era una contra la soberanía de los Estados Unidos. Concluyó, sin embargo, que la Ley del Congreso no prohibía la legislación local y que las cortes insulares tenían jurisdicción para castigar el delito bajo la ley local. Al efecto, se expresa así dicho Tribunal, a la página 261:

"El propósito perseguido por la Ley Foraker y la Ley Orgánica fué conceder a Puerto Rico plenos poderes de propia determinación local, con una autonomía similar a la de los estados y territorios incorporados. [Citas.] El efecto fué conferir al territorio muchos de los atributos de cuasisoberanía poseídos por los estados—como, por ejemplo, inmunidad a ser demandado sin su consentimiento. [Cita.] Por dichas leyes, la estructura de gobierno típica americana, consistente de los tres departamentos independientes—legislativo, ejecutivo y judicial—fué eregida. 'Un cuerpo político—un *commonwealth*— fué creado.' 31 Stat. 79, sección 7, c. 191. El poder de imponer contribuciones, el poder de aprobar y hacer cumplir leyes y otros poderes propiamente gubernamentales fueron conferidos. Y en lo que concierne a asuntos locales, como ya hemos demostrado con respecto a territorios continentales, le fueron conferidos poderes legislativos casi, si no tan, amplios, como los ejercitados por las legislaturas estatales.

"Esta amplia concesión de poderes legislativos hecha por el Congreso reconoce claramente la gran conveniencia de conferir al gobierno local la responsabilidad de crear delitos locales y de castigarlos en tribunales locales."

El lenguaje citado por ser de aplicación al caso de autos, sería suficiente para dejar contestado el ataque que hacen los apelantes a la jurisdicción de los tribunales insulares para en-

tender en su caso. Recuérdese sin embargo, que citando el mismo caso de *Shell*, dijimos en el de *Luce & Co.* v. *Junta Salario Mínimo*, 62 D.P.R. 452, que para ".... que el estatuto Federal excluya una ley insular encaminada a proteger la salud y bienestar del público, no basta que las dos leyes abarquen la misma materia. Es preciso que la ley insular por sus propios términos o en su administración práctica esté en conflicto con la ley del Congreso o manifiestamente infrinja la política pública de la ley Federal." Y en *Avila* v. *Tribunal de Distrito*, 68 D.P.R. 11, 17, dijimos que "En ausencia de una prohibición específica en una ley Federal contra legislación local, el Gobierno insular puede ejercer poderes concurrentes aprobando, bajo su poder de policía, legislación que cubra la misma materia, siempre y cuando que ésta no esté tan íntimamente mezclada y relacionada con responsabilidades del gobierno nacional, que su propia naturaleza de por sí haga surgir la inferencia de que se trata de un asunto que compete exclusivamente al gobierno nacional. ....." A nuestro juicio es evidente que la protección del gobierno de Puerto Rico contra la prédica subversiva no es de la exclusiva competencia del gobierno nacional. La conservación y garantía del orden, la paz, la seguridad y el bienestar general es responsabilidad primordialmente del gobierno insular. Negarle autoridad para legislar a esos fines equivaldría a privarle de aquellos atributos que son esenciales para el ejercicio de sus funciones gubernamentales. Por otro lado, la política pública de ambas leyes es la misma ya que persiguen el mismo fin o propósito y no alcanzamos a comprender como la Ley núm. 53 por sus propios términos o en su administración práctica esté en conflicto sustancial con la ley federal. En lo que respecta al argumento de que podría surgir un conflicto en cuanto a qué ley deberá ponerse en vigor y qué jurisdicción deberá invocarse, nos parece adecuado contestar como lo hicimos en el caso de *Irizarry* v. *Corte*, 64 D.P.R. 94, con la siguiente cita del caso de *Shell*, "Es difícil ver como podría surgir un con-

flicto en cuanto a qué ley deberá ponerse en vigor y qué jurisdicción deberá invocarse, toda vez que los funcionarios a cargo de la administración y ejecución de ambas leyes están, en último análisis, bajo el control de la misma soberanía y, puede muy bien asumirse, que trabajarán en armonía." Tal armonía ha existido entre los funcionarios federales y los insulares en la administración y ejecución de la Ley núm. 53 y la Ley Smith, ya que como cuestión de hecho todas las personas que en Puerto Rico han incurrido en la violación de una y otra ley han sido procesadas únicamente en los tribunales insulares por violación al estatuto local.

■ Los apelantes alegan además que el inciso tercero del artículo 1ro. de la Ley núm. 53 de 1948 es inconstitucional por sí mismo, independientemente de la inconstitucionalidad de que adolece la ley en su totalidad. Dicho inciso dispone lo siguiente:

"3. organizar o ayudar a organizar cualquier sociedad, grupo o asamblea de personas que fomenten, aboguen, aconsejen o prediquen la derrocación o destrucción del gobierno insular, o de cualquier subdivisión política de éste, por medio de la fuerza o la violencia."

Se basan los apelantes en que dicho inciso carece de elementos criminales suficientes y está lleno de vaguedad, dejando de ofrecer información necesaria e indispensable respecto al acto criminal prohibido. Argumentan que aunque el referido inciso fué tomado en parte de la Ley Smith,[10] por una inadvertencia de nuestra Legislatura no se incluyó en el mismo el elemento "a sabiendas" (*knowing the purpose thereof*) que aparece en la sección 2(*a*) (3) de la ley federal. A juicio de

---

[10] La sección 2(*a*) (3) de la Ley Smith dispone lo siguiente:

"Sección 2(*a*).—Será ilegal el que cualquiera persona . . . . .

"(3) Organice o ayude a organizar cualquier sociedad, grupo o asamblea de personas que prediquen, aboguen por, o fomenten, el derrocamiento o destrucción de cualquier gobierno en los Estados Unidos por medio de la fuerza o la violencia; o ser o convertirse en miembro de, o afiliarse a, cualquiera de esa clase de sociedad, grupo o asamblea de personas a sabiendas de su propósito."

ellos la falta de este elemento hace inconstitucional el inciso tercero de la ley insular y al efecto se expresan como sigue: "Para ser responsable criminalmente el ciudadano, debe actuar en pleno juicio, con la intención criminal de realizar el acto y a sabiendas de que dicho acto es prohibido y punible; y para poder hacérsele responsable de la organización de una asamblea subversiva, sería indispensable que el ciudadano hubiese sabido antes de organizarla, que en dicho acto se iba a violar la Ley, y sabiéndolo, que la hubiere organizado voluntariamente."

No tienen razón. Comparando ambos estatutos nos encontramos con que tanto el inciso tercero del artículo 1ro. de la Ley núm. 53 de 1948, como la sección 2(a)(3) de la Ley Smith castigan como delito el acto de *organizar o ayudar a organizar cualquier sociedad, grupo o asamblea de personas que fomenten, aboguen, aconsejen o prediquen la derrocación o destrucción del gobierno, por medio de la fuerza y la violencia.* La sección 2(a)(3) de la ley federal castiga además el acto de ser miembro o estar afiliado a una organización de esa naturaleza conociendo los propósitos de la misma.([11]) El elemento "a sabiendas" (*knowing the purpose thereof*) figura en la segunda parte de la sección 2(a)(3) de la ley federal, o sea, la que penaliza el ser miembro o estar afiliado a una organización subversiva. A pesar de ello, en el caso de *Dennis* v. *United States*, supra, se rechazó la contención de que la ley Smith adolecía de vaguedad y se sostuvo la constitucionalidad de la sección 2(a)(3). Sin embargo se aclaró en dicho caso que el estatuto requería como un elemento esencial del delito prueba de la intención de derrocar el gobierno por la fuerza y la violencia por parte de aquéllos que fueran acusados de su violación.

El elemento "a sabiendas" lo exige la ley Smith únicamente en cuanto al caso de ser miembro o estar afiliado a

---

([11]) Por la Ley núm. 13 de 20 de diciembre de 1950 la Legislatura de Puerto Rico adicionó una disposición similar a la ley insular.

organizaciones subversivas, aparentemente por el hecho real de que muchas personas se afilian a una organización sin conocer los propósitos de ésta, pero el que organiza o ayuda a organizar una asamblea de personas subversivas no puede alegar ignorancia del conocimiento de ese hecho que es el que expresamente castiga la ley. Por tanto, es innecesario que en el lenguaje definiendo el delito se incluya la frase "a sabiendas". Su omisión, sin embargo, no excluye la necesidad de probar la intención criminal, pues como se dijo en el caso de *Dennis*, supra, "El contexto (*structure*) y propósito del estatuto requieren que la intención se incluya como un elemento del delito".

Por último los apelantes alegan que el delito concebido por la Ley núm. 53 es de naturaleza continua y que ya ellos fueron juzgados y convictos ante la Sección de San Juan del Tribunal de Distrito de Puerto Rico por el mismo delito que ahora se le acusa (*jeopardy*).

La acusación radicada contra ambos apelantes ante la Sección de San Juan del anterior Tribunal de Distrito, les imputa una violación al inciso 1 del artículo 1 de la Ley núm. 53, cometido durante el período comprendido entre el 20 de octubre de 1948 y el 2 de noviembre de 1950.([12]) Por otro lado los hechos que se les imputa en los casos de autos cubren más o menos el mismo período de tiempo, o sea, desde el día 12 de octubre de 1948 hasta el 30 de octubre de 1950.([13])

---

([12]) Específicamente se les imputa a los apelantes en esa acusación que "en o alrededor de los días 26, 27 de octubre de 1950 en las municipalidades de Fajardo y San Juan, Puerto Rico, ilegal, criminal, maliciosa y voluntariamente y a sabiendas . . . . abogaron, aconsejaron y predicaron la necesidad, deseabilidad y conveniencia de derrocar, paralizar y destruir el Gobierno Insular de Puerto Rico y las subdivisiones políticas de éste por medio de la fuerza y la violencia . . . . ."

([13]) En la acusación radicada contra Burgos Fuentes en la Sección de Guayama del anterior Tribunal de Distrito se le imputó en los cargos números 1, 2, 3 y 4 sendas violaciones al inciso tercero del artículo 1 de la Ley núm. 53, cometidas en el Municipio de Cayey los días 25 de julio de 1948, 12 de octubre del mismo año, 12 de octubre de 1949 y 26 de octubre de 1950, respectivamente. En el cargo número 5 se le imputa una violación

La primera acusación fué radicada en la Sección de San Juan del anterior Tribunal de Distrito, en diciembre de 1950 por lo que todos los hechos alegados en las acusaciones radicadas en la Sección de Guayama del mismo tribunal ocurrieron con anterioridad a la radicación de aquella primera acusación. Por tanto, de ser el delito definido y castigado por la Ley núm. 53 uno de los llamados delito continuo, la alegación de exposición por segunda vez (*former jeopardy*) hecha por los apelantes debe prevalecer si por otra parte en el récord hay prueba suficiente para demostrar (1) la radicación de la primera acusación y (2) la convicción anterior bajo esa acusación. Ello es así porque en los casos de los llamados delito continuo la regla general es que no puede procesarse al acusado en forma fragmentaria. "Una vez que se entabla y se concluye un caso, éste impide toda prosecución por el mismo delito en cuanto a hechos que ocurrieron con anterioridad a la denuncia; pero puede entablarse nueva denuncia por el mismo delito continuo, si se ha cometido después de la fecha de la denuncia, independientemente del resultado del primer caso . . . . . . ." *Pueblo* v. *Lugo*, 64 D.P.R. 554. Sin embargo, si resolviéramos, como alega el Fiscal de este Tribunal, que en el récord no hay prueba de los hechos que puedan servir de base a la alegación de exposición por segunda vez (*former jeopardy*),([14]) siempre tendríamos que entrar a considerar la naturaleza del delito creado por la Ley núm. 53, toda vez que en las acusaciones radicadas en Guayama se le imputaron

---

a los incisos 1 y 3 de la ley cometida en el mismo municipio durante los meses de junio, julio, agosto, septiembre y octubre de 1950. A López Vázquez se le imputó en el cargo número 1 una violación al inciso tercero del artículo 1 de la ley y en el cargo número 2 una violación a los incisos 1 y 3.

([14]) Los acusados presentaron en la corte inferior para sostener su alegación de *jeopardy* copia de la acusación radicada contra ellos en la Sección de San Juan del anterior Tribunal de Distrito y además solicitaron de aquella corte que tomara conocimiento judicial de que los acusados habían sido procesados, convictos y sentenciados en la Sección de San Juan. Sostiene el Fiscal de esta corte que no se podía tomar tal conocimiento judicial y que por lo tanto no hubo prueba de la convicción anterior.

a Burgos Fuentes cinco cargos y dos a López Vázquez como delitos distintos, por actos similares, realizados en distintas fechas.

Un delito continuo es una transacción o una serie de actos continuos puestos en movimiento por un solo impulso y operados por una fuerza no intermitente, no importa cuán largo sea el tiempo que pueda ocupar. *State* v. *Johnson*, 194 S. E. 319, 322; *United States* v. *Midstate Co.*, 306 U. S. 161. De acuerdo con el tratadista Wharton, cuando el impulso es uno solo, procede una sola acusación, no importa por cuanto tiempo pueda continuar la acción, más si separadamente se dan impulsos sucesivos, aun cuando se unan en una corriente común de acción, proceden acusaciones separadas. Añade dicho tratadista que la norma a aplicar es el determinar si lo que se prohibe son los actos individuales o es el curso de acción que estos constituyen, siendo punibles, en el primer caso, cada acto separadamente mientras que en el segundo caso sólo puede haber una penalidad. 1 Wharton's *Criminal Law*, sección 34, página 52; *Blockburger* v. *United States*, 284 U. S. 299, 302, 76 L. ed. 306–308. Se ha dicho también que "continuo" significa perdurable, que no termina con un solo acto o hecho; que subsiste por un período de tiempo definido o que tiene el propósito de abarcar o de ser aplicable a obligaciones y acontecimientos sucesivos similares, y que un delito continuo, es por lo tanto, una infracción a la ley penal que no termina con un solo hecho o acto sino que subsiste por un período de tiempo definido y cuyo propósito es que abarque o se aplique a obligaciones o acontecimientos sucesivos similares. *State* v. *Johnson*, supra.

Como se ve, no es fácil establecer una regla fija y precisa para determinar cuándo un delito es continuo. Ello depende, en gran parte, de la intención legislativa y de las palabras del estatuto. Dangel, *Criminal Law*, página 376; 20 L.R.A. (N.S.) 783.

Ni la historia legislativa de la Ley núm. 53, ni los debates en las Cámaras en torno a su aprobación arrojan luz en cuanto

al punto en discusión. Sin embargo, del contexto del estatuto, del fin que éste persigue y por la naturaleza del campo que ha invadido, puede inferirse que el legislador tuvo la intención de definir y castigar un delito de los llamados delitos continuos. Evidentemente la Ley núm. 53 trata de prevenir que el gobierno constituído pueda ser cambiado por medio de la fuerza y de la violencia. *Dennis* v. *United States*, supra. Como medida preventiva el estatuto prohibe una serie de actos encaminados al mismo fin, que ha dividido en tres grupos bajo los tres incisos de su artículo primero. Por el inciso 1 prohibe la prédica subversiva por medio de la palabra hablada, por el inciso 2 prohibe la misma prédica pero por medio de la palabra escrita y por el inciso 3 prohibe la organización de sociedades, grupos o asambleas de personas subversivas. En otras palabras, para lograr su propósito la ley trata de prevenir la prédica subversiva a través de discursos, impresos o asambleas. En verdad, no persigue actos individuales, sino adoctrinamiento, actitud, prédica. En suma, se castiga una norma de conducta (*course of conduct*) y no los actos específicos cometidos en obediencia a esa norma. Siendo ello así, esto significa, según hemos apuntado antes, que el gobierno no puede fraccionar el delito en tantos delitos como actos se hayan cometido.

Existen razones poderosas en apoyo de este criterio. En primer lugar, la práctica de fraccionar el delito, como ha ocurrido en este caso, implica brindar oportunidad al desarrollo de la prédica subversiva, lo que claramente es contrario al propósito del estatuto, el cual quedaría frustrado una vez que el gobierno asumiera una actitud de peligrosa espera frente a sus infractores. Por otro lado, si el gobierno pudiera fraccionar el delito a su voluntad, ello implicaría que podría aumentar o agravar la pena prescrita por el estatuto, la que por cierto es en sí severa ya que se extiende hasta un máximo de 10 años de presidio y $10,000 de multa.([15]) Ob-

---

([15]) Veamos el siguiente ejemplo: Una persona organiza 5 asambleas de personas subversivas dentro del término de un mes. En cada asamblea

viamente ésa no ha sido la intención del legislador.

Además, no debe olvidarse que la Ley núm. 53 establece una limitación a ciertos derechos constitucionales que son vitales para la existencia misma de la democracia, a saber; la libertad de palabra, de prensa y de reunión en asamblea. Aunque tales derechos no son absolutos, *Dennis* v. *United States*, supra, las leyes que en alguna forma los limitan deben ser interpretadas restrictivamente a fin de que esa limitación no traspase el límite de lo absolutamente necesario.

Concluímos que el delito definido y castigado por la Ley núm. 53 es uno de los llamados delito continuo. En consecuencia, procede ahora examinar la alegación de exposición anterior (*former jeopardy*) planteada por los acusados– apelantes.

A esta defensa el fiscal de esta corte formula dos oposiciones, (1) que el delito previsto por la Ley núm. 53 no es de naturaleza continua, y (2) que en el récord no hay prueba suficiente para sostener tal defensa. La primera oposición ha sido ya resuelta a favor de los apelantes. Veamos la segunda. Es cierto que en el tribunal sentenciador los acusados se limitaron a presentar en evidencia copia de la acusación radicada en la Sección de San Juan del anterior Tribunal de Distrito y que en cuanto a la sentencia dictada bajo esa acusación, en vez de presentarla como prueba, solici- taron de dicho tribunal que tomara conocimiento judicial de ella. La contención del fiscal es que la corte a quo no podía tomar conocimiento judicial de esa sentencia. Sin embargo, no niega que los acusados–apelantes fueran convictos y sen- tenciados por la Sección de San Juan del Tribunal de Distrito. Por otro lado ante nos está pendiente de resolución el recurso

---

distribuye escritos donde se predica la necesidad de derrocar el gobierno por medio de la fuerza. Además esa persona pronuncia un discurso en cada una de las asambleas predicando la misma necesidad. Si el delito previsto por la Ley núm. 53 no fuera un delito continuo, esa persona estaría sujeta a ser condenada a sufrir una pena máxima de 150 años de presidio y $250,000 de multa, o sea, a base de 5 infracciones a cada uno de los 3 incisos del artículo primero de la ley.

de apelación interpuesto por los acusados contra dicha sentencia. Asumimos que podemos tomar conocimiento de esa sentencia la cual forma parte de nuestros propios records. *Wiley* v. *United States*, 144 F.2d 707; *National Fire Ins. Co.* v. *Thompson*, 281 U. S. 331; *Morse* v. *Lewis*, 54 F.2d 1027; *Divide Creek Irr. Dist.* v. *Hollingsworth*, 72 F.2d 859; *Commonwealth* v. *Di Stasio*, 11 N. E.2d 799; *Alexander* v. *Hillman*, 296 U. S. 222; *Washington & Idaho Railroad* v. *Osborn*, 160 U. S. 103; *Aspen Mining & Smelting Co.* v. *Billings*, 150 U. S. 31.

*Procede declarar con lugar la defensa de exposición anterior (former jeopardy) y en su consecuencia se revocarán las sentencias apeladas, y se dictarán otras absolviendo a los acusados–apelantes.*

Los Jueces Asociados Sres. Negrón Fernández y Ortiz no intervinieron.