EL PUEBLO DE PUERTO RICO, demandante y apelado, *v*. RUTH M. REYNOLDS, RAFAEL BURGOS FUENTES, y EDUARDO LÓPEZ VÁZQUEZ, acusados y apelantes.

Número 15456.

*Sometido:* 5 de noviembre de 1953.   *Resuelto:* 17 de noviembre de 1954.

*F. Hernández Vargas, J. Hernández Vallé* y *Conrad Lynn,* abogados de los apelantes; *Hon. Secretario de Justicia Interino J. B. Fernández Badillo* y *Rafael L. Ydrach Yordán* y *Jaime García Blanco, Fiscal Auxiliar y Fiscal Especial, respectivamente, del Tribunal Supremo,* abogados de El Pueblo, apelado. *Santos P. Amadeo,* abogado de la Unión de Libertades Civiles, ésta como *amicus curiae.*

El Juez Asociado Señor Pérez Pimentel emitió la opinión del Tribunal.

Ruth M. Reynolds, Rafael Burgos Fuentes, José Mejías Flores y Eduardo López Vázquez fueron acusados conjuntamente ante el anterior Tribunal de Distrito de Puerto Rico, Sección de San Juan, de infringir el inciso primero del art. 1 de la Ley núm. 53 (1948 ((2) pág. 171).[1] La acusación consta de dos cargos. El primero va dirigido contra Ruth M. Reynolds solamente y en el mismo se le imputa sustancialmente, que el día 18 de diciembre de 1949, en Arecibo, Puerto Rico, ilegal, criminal, maliciosa, voluntariamente y a sabiendas, siendo una líder y miembro activo del Partido Nacionalista de Puerto Rico, allí y entonces fomentó, abogó,

---

[1] Esta ley fué enmendada por la Ley núm. 13 de 20 de diciembre de 1950 (Leyes de 1950–51, pág. 369). Los hechos imputados a los apelantes ocurrieron con anterioridad a la enmienda. Por tanto, la acusación les imputa una violación a la ley original, la cual, disponía lo siguiente:

"Artículo 1.—Constituirá delito grave (*felony*) castigable con pena máxima de presidio de diez (10) años o multa máxima de $10,000, o ambas penas, la comisión por cualquier persona de cualquiera de los siguientes actos: .

"1. fomentar, abogar, aconsejar o predicar, voluntariamente o a sabiendas la necesidad, deseabilidad o conveniencia de derrocar, paralizar o destruir el gobierno insular, o cualquier subdivisión política de éste, por medio de la fuerza o la violencia;

"2. imprimir, publicar, editar, circular, vender, distribuir o públicamente exhibir, con la intención de derrocar, paralizar o destruir el Gobierno Insular o cualquiera de sus divisiones políticas, cualquier escrito o publicación donde se fomente, abogue, aconseje o predique la necesidad, deseabilidad o conveniencia de derrocar, paralizar o destruir el Gobierno Insular o cualquier subdivisión política de éste, por medio de la fuerza o la violencia;

"3. organizar o ayudar a organizar cualquier sociedad, grupo o asamblea de personas que fomenten, aboguen, aconsejen o prediquen la derrocación o destrucción del gobierno insular, o de cualquier subdivisión política de éste, por medio de la fuerza o la violencia."

aconsejó y predicó la necesidad, deseabilidad y conveniencia de derrocar, paralizar y destruir el Gobierno Insular de Puerto Rico y las subdivisiones políticas de éste por medio de la fuerza y la violencia, "Cuando al asistir y participar activamente en una asamblea de la referida agrupación denominada 'Partido Nacionalista de Puerto Rico', públicamente y en unión a los demás asistentes a dicha asamblea se comprometió bajo juramento a dar su vida y su hacienda para lograr el derrocamiento, la paralización y la destrucción del Gobierno Insular de Puerto Rico y de sus divisiones políticas y establecer la República de Puerto Rico a través de la revolución armada . . ." todo ello como parte de un movimiento para conseguir la separación de Puerto Rico de los Estados Unidos por medio de la fuerza y la violencia.

En el segundo cargo se imputa a todos los acusados que en o alrededor de los días 26 y 27 de octubre de 1950, y en las municipalidades de Fajardo y San Juan, fomentaron, abogaron, aconsejaron y predicaron la necesidad, deseabilidad y conveniencia de derrocar, paralizar y destruir el Gobierno Insular de Puerto Rico y las subdivisiones políticas de éste por medio de la fuerza y la violencia, "al reunirse como se reunieron en la municipalidad de Fajardo y ocuparon el automóvil con las placas de números PA53,664 dentro del cual llevaban consigo y tenían a su disposición armas de fuego y bombas incendiarias, trasladándose los aquí acusados en dicho automóvil hasta la ciudad de San Juan en unión a otros automóviles ocupados también por líderes y miembros activos de la referida agrupación denominada 'Partido Nacionalista de Puerto Rico', todo ello como parte de un movimiento separatista impulsado por los aquí acusados . . . y otros individuos, pertenecientes todos a la agrupación denominada 'Partido Nacionalista de Puerto Rico', encaminado dicho movimiento a conseguir la separación de Puerto Rico de los Estados Unidos por medio de la fuerza y la violencia, y con el propósito de participar en la revuelta en que culminó el día 30 de octubre de 1950 el referido movimiento separatista."

La Reynolds fué juzgada por un jurado y los otros coacusados por tribunal de derecho, después que éstos renunciaron al jurado. Sin embargo, se celebró un solo juicio para todos los acusados. El jurado declaró a la Reynolds culpable del primer cargo y no culpable del segundo. Por su parte el Juez que presidía la sala absolvió a José Mejías Flores y declaró culpables a Rafael Burgos Fuentes y a Eduardo López Vázquez. Ruth M. Reynolds fué sentenciada a cumplir de 2 a 6 años de presidio; Burgos Fuentes a cumplir de un mes a 5 años de presidio y López Vázquez a cumplir de un día a 2½ años de presidio. Contra dichas sentencias interpusieron los acusados el presente recurso de apelación.(²)

La apelante Ruth M. Reynolds imputa a la corte a quo la comisión de varios errores.(³) Sin embargo, en vista del resultado a que habremos de llegar, bastará considerar únicamente el que ataca la suficiencia de la prueba para sostener la convicción de la apelante. Examinemos, por lo tanto, la de cargo, a la cual el jurado, en vista del veredicto rendido, dió crédito.

El día 18 de diciembre de 1949, según dicha prueba, se celebró en el teatro Navas de Arecibo, una asamblea del Partido Nacionalista de Puerto Rico. Ocuparon asientos en el proscenio del teatro algunos de los dirigentes de dicha agrupación y su presidente Pedro Albizu Campos. La asistencia a dicha asamblea era de unas 500 personas entre las cuales se encontraba la apelante Ruth M. Reynolds. En horas de la tarde el Comité de Ponencia, previamente nombrado por Albizu Campos, anunció a la asamblea que sometía los nombres de Pedro Albizu Campos, Jacinto Rivera Pérez y Rai-

---

(²) En el recurso interpuesto por Ruth M. Reynolds, la Unión Americana de Libertades Civiles solicitó y obtuvo permiso para comparecer y ha comparecido como *amicus curiae*.

(³) Durante la vista celebrada ante nos, la apelante renunció a los errores relacionados con la selección del jurado, y la admisión de cierta evidencia. La contención respecto a la inconstitucionalidad de la Ley núm. 53 de 1948 fué resuelta por nosotros en su contra en el reciente caso de *Pueblo* v. *Burgos, et al.*, 75 D.P.R. 551. La Unión Americana de Libertades Civiles no cuestiona la constitucionalidad de dicho estatuto.

mundo Díaz Pacheco para Presidente, Vice-Presidente y Tesorero, respectivamente, del Partido Nacionalista, siendo tal nominación aceptada por aclamación. Acto seguido, Albizu Campos procedió a hacer otros nombramientos, luego de lo cual informó a la asamblea que quería decir algunas cosas. En su discurso acusó a los nacionalistas de ser indiferentes al movimiento; de no haber cumplido con su misión cuando se les ha ordenado hacer una colecta para recaudar los fondos que necesita el partido; de no ser patriotas como aquéllos que ofrendaron sus vidas por el movimiento; que para mañana se necesitaban $600 para preparar los alegatos de seis nacionalistas convictos de rehuir el servicio selectivo, y que estos alegatos había que presentarlos en inglés ante la Corte de Circuito de Boston. (4) Fué durante esta peroración, claramente encaminada a conseguir fondos, que Albizu Campos pidió a los presentes que se pusieran de pie y que con la

(4) El texto del discurso de Albizu Campos, según fué narrado por un testigo de cargo, es como sigue:

"Que los nacionalistas en Puerto Rico estaban siendo indiferentes con el movimiento libertador; que Julio de Santiago como Tesorero del Partido había hecho lo indecible pero ustedes—se refería a la asamblea—no se imaginan lo que ha sufrido ese pobre hombre. Yo les quiero decir que el movimiento nacionalista tiene que reforzarse; que cuando se le asigne una misión a uno de ustedes no quiero que vayan a San Juan a decirme que no la han podido llevar a cabo; que cuando se decrete una colecta por el Partido Nacionalista son ustedes los que tienen que conseguir los fondos. Nosotros no podemos pedir nada a los enemigos del movimiento libertador; no son 2 ni 3 mil dólares los que se necesitan, son cientos de miles de dólares los que necesita el movimiento libertador para llevar a cabo su misión y que si a los viejos les parece que porque asisten a las asambleas y mítines del partido y porque cumplieron en prisiones federales ya se graduaron de patriotas están equivocados. Patriotas fueron Manuel Suárez Díaz quien en las propias escalinatas del Capitolio en 1936 y siendo un niño, ofrendó su vida para evitar que la bandera de la patria fuera profanada. Patriota fué López Antongiorgi que a la edad de 20 años se enfrentó a las balas del imperio.

"   .        .        .        .        .        .        .        .

"No quiero saber de los 4 ó 5 cadetes que tenemos en cada pueblo. Quiero que el Ejército Libertador sea el ejército más fuerte en Puerto Rico listo para la acción. Luego les anunció últimamente: Para mañana necesito en San Juan $600 y estos $600 se usarán para preparar los alegatos en relación con los casos de los 6 nacionalistas convictos de rehuir el servicio selectivo y que estos alegatos se tenían que presentar ante la Corte de Circuito de Boston en inglés."

mano en alto prestaran el siguiente juramento: "¿Juran ustedes dar la vida y la hacienda en aras del movimiento libertador? ¿Están dispuestos a sacrificar la vida?" Puestos de pie los presentes y con la mano en alto contestaron que sí. Ruth Reynolds, quien ocupaba un asiento a la entrada del teatro, como en la tercera o cuarta fila, prestó ese juramento.

El resto de la prueba presentada contra esta apelante tendió a demostrar (a) que ella vivió desde julio de 1949 hasta noviembre 2 de 1950 en las casas de los nacionalistas Juan Alamo Díaz, Carlos Vélez Rieckehoff y Paulino Castro; (b) que ella asistió a los distintos actos celebrados por el Partido Nacionalista de Puerto Rico desde el 1948 hasta el 1950, y aplaudió a los oradores que participaban en dichos actos; [5] y (c) organización y fines del cuerpo creado y afiliado al Partido Nacionalista, llamado "Los Cadetes" de la República y existencia de la llamada "Fase Revolucionaria" dentro de dicho partido, integrada por aquellos nacionalistas que estaban dispuestos a dar su vida y hacienda por la independencia de Puerto Rico, y (d) los sucesos sangrientos del 30 de octubre de 1950 provocados por miembros del Partido Nacionalista y en los cuales no tuvo participación activa la apelante Ruth M. Reynolds. Ésa es sustancialmente la prueba que sirvió de base al veredicto de culpabilidad rendido por el jurado contra esta apelante. Más adelante consideraremos si dicha prueba sostiene el veredicto. Veamos ahora cuál fué la prueba que tuvo ante sí el juez sentenciador para declarar culpables a los coacusados Rafael Burgos Fuentes y Eduardo López Vázquez.

[5] Estos actos fueron: Asamblea Anual del Partido Nacionalista celebrada en el Ateneo en diciembre 19 de 1948; Conmemoración de la "Masacre de Ponce" en marzo 21 de 1949; Conmemoración del natalicio de José de Diego, en San Juan, el día 18 de abril de 1949; Acto de protesta celebrado en Guánica el 25 de julio de 1949; Conmemoración del "Grito de Lares", en septiembre 23 de 1949; Conmemoración del natalicio del General Valero en Fajardo, el día 28 de octubre de 1949 y Conmemoración del Descubrimiento de Puerto Rico, en Aguada, el día 19 de noviembre de 1949.

En cuanto al cargo específico imputado en la acusación a estos otros coacusados, la prueba de cargo demostró lo siguiente: En la noche del 26 de octubre de 1950, el Partido Nacionalista celebraba un mitin en Fajardo para conmemorar el natalicio del General Valero. En horas de la mañana de ese día los cadetes de la República se reunieron en la Avenida General Valero y de allí partieron hacia la Iglesia Católica de Fajardo acompañados por miembros del Partido Nacionalista, entre ellos Albizu Campos, Ruth M. Reynolds y Burgos Fuentes. El coacusado López Vázquez participaba como cadete y vestía el uniforme de éstos. Al pasar frente a la escuela "Valero", Burgos Fuentes repartió banderas de las Repúblicas Suramericanas entre los estudiantes de dicho plantel y les invitó al acto. De la iglesia se dirigieron hacia el cementerio donde depositaron una corona sobre la tumba de Jesús Siaca Martínez. Luego regresaron al pueblo y se disolvieron hasta por la tarde cuando se celebró el mitin, en el cual participó como orador Albizu Campos. Los acusados aplaudieron su discurso. Terminado el acto, los acusados Burgos Fuentes, López Vázquez, Ruth M. Reynolds y José Mejías Flores, abordaron el automóvil PA53-664, conducido por Miguel Rosario Aulet para trasladarse a San Juan. Detrás de este vehículo, salieron otros ocupados por nacionalistas y en último término dos vehículos de los miembros de la detective. Al llegar a Río Piedras y con motivo de haber cruzado la luz roja de tránsito uno de los vehículos ocupados por nacionalistas, la detective emprendió su persecución hasta que finalmente le detuvieron en la parada 26, frente al Garage Charneco. Al conductor de ese vehículo, Antonio Moya Vélez le fué ocupada una pistola. El otro vehículo ocupado por los acusados se detuvo cerca de aquel sitio, bajándose del mismo Burgos Fuentes a quien al acercarse a uno de los detectives le fué ocupada una pistola, una caja conteniendo 50 balas y un peine cargado con 27 balas. A López Vázquez también le ocuparon en uno de sus bolsillos una pistola con su peine y ocho balas más. Al registrar el vehículo ocupado por los

acusados los detectives encontraron en el mismo cinco botellas de las conocidas con el nombre de "Cocktail Molotov". En el baúl de dicho vehículo se ocuparon además varios uniformes de los cadetes del Ejército Libertador y un maletín conteniendo artículos personales. En una gaveta ocuparon una caja de fósforos y un pequeño cuchillo como de dos pulgadas de largo. Todos los acusados fueron arrestados y conducidos al cuartel de la policía. Finalmente, Burgos Fuentes y López Vázquez fueron acusados y sentenciados por infracción a la Ley de Armas.

La otra prueba presentada contra estos coacusados es más o menos la misma presentada contra la Reynolds, y la que según hemos ya reseñado cubre las actividades del Partido Nacionalista durante un período de dos años. En adición a dicha prueba, la presentada contra Burgos Fuentes y López Vázquez tiende a demostrar (a) que en la residencia de Heriberto Castro el día 23 de septiembre de 1950, Burgos Fuentes le entregó un arma de fuego a Ángel Colón, diciéndole: "Toma para que te defiendas el día de la revolución"; (b) que en dos actos celebrados por el Partido Nacionalista, uno en Ponce y el otro en San Juan, Burgos Fuentes dió órdenes a los cadetes del Ejército Libertador de que atacaran a los policías y a los detectives en caso de que éstos atacaran a Albizu Campos; (c) que al terminarse un mitin celebrado por el Partido Nacionalista la noche del 16 de abril de 1950 en el Barrio Obrero y cuando un vehículo ocupado por detectives trató de seguir el vehículo abordado por Albizu Campos, un grupo de nacionalistas, entre los que se encontraban Burgos Fuentes y López Vázquez, trataron de volcar el vehículo de la detective y que el grupo daba gritos de "Abajo los cipayos", "Abajo el Gobierno", "Hay que derrocar este Gobierno", (d) que en la finca de Burgos Fuentes ubicada en Cayey, se preparaban bombas (Cocktail Molotov) y varios nacionalistas se ejercitaban en la práctica de tiro al blanco.

¿Es esa prueba suficiente para sostener una convicción bajo el inciso 1 del art. 1 de la Ley núm. 53? Opinamos

que no. Ya hemos visto que lo que dicho inciso prohibe es *fomentar, abogar, aconsejar o predicar*, voluntariamente o a sabiendas la necesidad, deseabilidad o conveniencia de derrocar, paralizar o destruir el Gobierno Insular, o cualquier subdivisión política de éste, por medio de la fuerza o la violencia. Tanto este lenguaje como el usado en las demás disposiciones de la Ley 53, es similar al lenguaje de la sec. 2 (*a*) (1), (2) y (3) de la ley federal conocida como la "Ley Smith". (⁶) En verdad ambos estatutos, en sus respectivas áreas de efectividad, persiguen idéntico propósito y en las indicadas secciones prohiben y castigan los mismos actos. El nuestro es casi una traducción de la "Ley Smith". (⁷) De aquí que los apelantes aleguen que como ya el Congreso Americano había cubierto el mismo campo o asunto tratado por la Ley 53, nuestra Legislatura carecía de facultad para aprobar este último estatuto. En *Pueblo* v. *Burgos et al.*, 75 D.P.R. 551 sostuvimos la validez de la Ley 53 y rechazamos esta contención de los apelantes.

■ No hay duda alguna y el apelado parece así acep-

---

(⁶)"Alien Registration Act", aprobada por el Congreso de los Estados Unidos en junio 28 de 1940.

(⁷)La sec. 2(*a*)(1), (2) y (3) de la Ley Smith, en su texto inglés, dispone:

"Sec. 2 (a) It shall be unlawful for any person—

"(1) to konwingly or willfully advocate, abet, advise, or teach the duty, necessity, desirability, or propriety of overthrowing or destroying any government in the United States by force, or violence, or by the assassination of any officer of any such government;

"(2) with intent to cause the overthrow or destruction of any government in the United States, to print, publish, edit, issue, circulate, sell, distribute, or publicly display any written or printed matter advocating, advising, or teaching the duty, necessity, desirability, or propriety of overthrowing or destroying any government in the United States by force or violence;

"(3) to organize or help to organize any society, group, or assembly of persons who teach, advocate, or encourage the overthrow or destruction of any government in the United States by force or violence; or to be or become a member of, or affiliate with, any such society, group, or assembly of persons, knowing the purposes thereof."

Cuya versión al castellano es la siguiente:

"Sec. 2 (*a*) Será ilegal para cualquier persona—

"(1) a sabiendas o voluntariamente abogar, instigar, aconsejar o enseñar el deber, la necesidad, deseabilidad o la conveniencia de derrocar o

tarlo, que los términos abogar, aconsejar y predicar, implican el uso de lenguaje. La palabra "abogar" que es como en nuestra ley se traduce al castellano la voz inglesa *"advocate"* tiene según el Diccionario de la Lengua Española, Ed. de 1947, pág. 5, dos acepciones, a saber: 1—"Defender en juicio, por escrito o de palabra. //2. fig. Interceder, hablar en favor de alguno." La palabra *"advocate"* según el Century Dictionary es "el acto de instar a, apoyar o recomendar, auspiciar activamente". *Gitlow* v. *New York*, 268 U. S. 652. Según el Standard Dictionary, la palabra *"advocate"* significa: "Hablar a favor de; exponer, defender o justificar una causa con argumentos; alegar, sostener, como un defensor del oprimido." Véase *Ex parte Bernat*, 255 Fed. 429. Es primordialmente con este significado que dicha palabra se usa en la Ley Smith. *United States* v. *Schneiderman*, 106 F. Supp. 906. "Aconsejar", según el Diccionario de la Lengua Española ya citado, pág. 18, significa: "Dar consejo" y según el mismo diccionario, pág. 337, "consejo" significa "parecer o dictamen que se da o toma para hacer o no hacer una cosa". La palabra "predicar" que presumimos fué la traducción que se hizo al español de la palabra *"teach"*, usada en la Ley Smith, quiere decir, "Publicar, hacer patente y clara una cosa. //2. Pronunciar un sermón. //3. Alabar con exceso a un sujeto. //4. fig. Reprender agriamente a

destruir cualquier gobierno en los Estados Unidos por la fuerza o la violencia, o por medio del asesinato de cualquier funcionario de cualquiera de dichos gobiernos;

"(2) con la intención de causar el derrocamiento o destrucción de cualquier gobierno en los Estados Unidos, imprimir, publicar, editar, emitir, circular, vender, distribuir o anunciar públicamente cualquier materia escrita o impresa abogando, aconsejando o enseñando el deber, la necesidad, deseabilidad o la conveniencia de derrocar o destruir cualquier gobierno en los Estados Unidos por la fuerza o la violencia;

"(3) organizar o ayudar a organizar cualquier sociedad, grupo o asamblea de personas que enseñan, abogan o estimulan el derrocamiento o destrucción de cualquier gobierno en los Estados Unidos por la fuerza o la violencia; o ser o hacerse miembro de, o asociarse con cualquiera de dichas sociedades, grupos o asambleas de personas, conociendo los propósitos de los mismos."

uno de un vicio o defecto. //5. fig. y fam. Amonestar o hacer observaciones a uno para persuadirle de una cosa." Según se usa en la Ley Smith, la palabra *"teach"* significa, "instruir . . . enseñar . . . guiar en los estudios de . . . .," *United States* v. *Schneiderman,* supra. Finalmente la palabra "fomentar" que fué sustituída en nuestra ley por la de *"abet"* usada en la Ley Smith y que es alrededor de la cual gira toda la argumentación del fiscal para justificar la convicción de los apelantes, no tiene en castellano el mismo significado que aquélla en inglés. "Fomentar" quiere decir, según el Diccionario de la Lengua Española, pág. 606, "dar calor natural o templado que vivifique o preste vigor. //2. fig. Excitar, promover o proteger una cosa. //3. fig. Atizar, dar pábulo a una cosa." Es indudable que este vocablo ha sido usado en la Ley 53 en su sentido figurado y su significado es el de "excitar, promover o avivar pasiones".

De lo expuesto resulta obvio que todas estas palabras, y nos inclinamos a decidir que ése es el espíritu de la ley, implican instar a la acción. No hay duda alguna de que el estatuto en ese primer inciso de su primer artículo prohibe la propaganda subversiva por medio de la palabra hablada, llámesele fomentar, abogar, aconsejar o predicar. *Pueblo* v. *Burgos et al.,* supra.

� El fiscal de esta Corte parece admitir que el solo hecho de prestar un juramento como lo hizo la apelante Ruth M. Reynolds en la asamblea de Arecibo o el de abordar un automóvil llevando bombas, armas de fuego y uniformes del Ejército Libertador, como lo hicieron Burgos Fuentes y López Vázquez, no justifican una convicción bajo el inciso 1 del art. 1 de la Ley 53. Arguye sin embargo, que "cuando esos mismos hechos se consideran conjuntamente con las circunstancias que les rodean, se juzgan con relación al carácter, posición y liderato de quienes los ejecutan, se evalúan a la luz de las demás actividades a que ellos se dedican, de sus actuaciones anteriores, del carácter, finalidad y propósito de la en-

tidad a que está afiliado, y de las gestiones y prédicas de los colíderes en esa agrupación, cesan de ser actuaciones inocentes para constituir actos delictivos, culposos, ejecutados con el único y deliberado propósito de fomentar, abogar, y predicar el derrocamiento del gobierno por la fuerza y la violencia.

"Fué lo que dejamos expuesto—no lo que pretenden en sus alegatos—lo que se *imputó* y *probó* a los acusados apelantes en los respectivos cargos en que fueron hallados culpables de infracción a la Ley núm. 53, supra."

Quizás el fiscal tendría razón si los apelantes hubieran sido acusados y convictos de pertenecer o estar afiliados a una sociedad subversiva a sabiendas de su propósito, o de una conspiración para cometer los distintos actos prohibidos por la Ley 53. Sin embargo bajo la acusación formulada a los apelantes el Pueblo venía obligado a probar que ellos fomentaron, abogaron, aconsejaron o predicaron, algo que la ley prohibe, o sea, la necesidad, deseabilidad y conveniencia de derrocar, paralizar o destruir el Gobierno de Puerto Rico por medio de la fuerza o la violencia. Ni el juramento prestado por la Reynolds ni su afiliación al Partido Nacionalista, ni su asistencia a los distintos actos celebrados por dicha agrupación pueden clasificarse como actos delictivos bajo el inciso 1 que comentamos de la Ley 53. Si las actividades a que se han dedicado los apelantes constituyen o no algún otro delito bajo la Ley 53, es cuestión que no estamos resolviendo ahora. Nuestra decisión está limitada a los hechos que presenta el récord de este caso. Tales hechos, repetimos, no constituyen el delito imputado a los apelantes.

Por todo lo expuesto, *las sentencias apeladas serán revocadas y se dictará otra absolviendo a los acusados-apelantes.*