EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.* DEUS-
DEDIT MARRERO NAZARIO, acusado y apelante.

Número 15612.
*Sometido:* 1 de mayo de 1956. *Resuelto:* 3 de octubre de 1956.

*Ramón H. Vargas, Luis A. Garrastegui* y *Pablo M. García,* abogados del apelante; *Hon. Secretario de Justicia Interino J. B. Fernández Badillo* y *Jaime García Blanco, Fiscal Especial del Tribunal Supremo,* abogados de El Pueblo, apelado.

### SENTENCIA

San Juan, Puerto Rico, a 3 de octubre de 1956.

Por los motivos que próximamente se consignarán, se revoca la sentencia apelada que dictó el Tribunal Superior, Sala de Arecibo, con fecha 21 de noviembre de 1951, en el caso de epígrafe, y se absuelve al acusado.

Así lo pronunció y manda el Tribunal y firma el Sr. Juez Presidente. Los Jueces Asociados Sres. Marrero, Negrón Fernández y Belaval disintieron.

A. C. SNYDER,
*Juez Presidente*

Certifico:

IGNACIO RIVERA
*Secretario.*

---

Opinión del Juez Presidente Sr. Snyder en la cual concurre el Juez Asociado Sr. Pérez Pimentel.

14 de diciembre de 1956.

Voté a favor de que se revocara la sentencia y se absolviera al acusado porque en mi opinión la evidencia aducida durante el juicio no estableció, fuera de duda razonable, que el acusado fuera culpable *del delito imputádole en la acusación.*

■ A la luz del razonamiento de la opinión del Juez Asociado Sr. Sifre, convengo en que existe la posibilidad de que el Tribunal Supremo de los Estados Unidos resuelva eventualmente que *los comunistas* que aboguen por el derrocamiento de un gobierno *estatal* mediante la fuerza y la violencia pueden ser castigados criminalmente sólo por el gobierno federal mientras esté en vigor la Ley Smith. Pero hasta la fecha no ha decidido eso. [1] Mientras esa sustancial cuestión constitucional permanezca sin resolver, opino que debemos aplicar al presente caso la bien sentada doctrina de que tales cuestiones constitucionales deben evitarse cuando un caso puede ser resuelto por otros motivos. [2] La evidencia que surge de los autos desde mi punto de vista no sostiene el vere-

---

[1] El caso de *Pennsylvania* v. *Nelson*, 350 U. S. 497, resuelve que la Ley Smith—54 Stat. 670, 18 U.S.C. sec. 2385—suplanta la Ley de Sedición de Pensilvania en tanto en cuanto ésta prohibe que los comunistas aboguen por el derrocamiento del *Gobierno de los Estados Unidos* mediante fuerza y violencia. Sin embargo, deja abierta la cuestión de la facultad de un *estado* para castigar tal abogamiento por el derrocamiento de un gobierno *estatal* por medio de fuerza y violencia. *Cf. Commonwealth* v. *Gilbert*, 134 N.E.2d 13 (Mass., 1956); *Braden* v. *Commonwealth*, 291 S.W.2d 843 (Ky., 1956); *Nelson* v. *Wyman*, 105 A.2d 756, 769–70 (N.H., 1954); *Wyman* v. *Sweezy*, 121 A.2d 783 (N.H., 1956), *certiorari* expedido, 352 U. S. 812, 25 U.S.L. Week 3093; *Kahn* v. *Wyman*, 123 A.2d 166 (N.H., 1956); Hunt, *Federal Supremacy and State Anti-Subversive Legislation*, 53 Mich. L. Rev. 407; *Albertson* v. *Millard*, 106 F. Supp. 635 (U. S. Dist. Ct., Mich., 1952), sentencia dejada sin efecto en 345 U. S. 242; *The Supreme Court 1955 Term*, 70 Harv. L. Rev. 83, 116–20 (noviembre de 1956). Además, aun cuando esta cuestión se resuelva finalmente contra *un estado*, siempre quedaría el problema en cuanto al efecto de tal decisión sobre un estatuto penal de Puerto Rico contra conducta subversiva local. Véase *Carrión* v. *González*, 125 F. Supp. 819 (U. S. Dist. Ct., P. R., 1954) y el escolio 2, infra.

[2] ". . . [T]odas las cortes sabiamente evitan cuestiones constitucionales siempre que sea posible." *Tesorero* v. *Tribunal Contribuciones y Kemper*, 71 D.P.R. 298, 303, citando *District of Columbia* v. *Little*, 339 U. S. 1; *Buscaglia* v. *Fiddler*, 157 F.2d 579 (C.A. 1, 1946); *Walker* v. *Tribl. Contribuciones y Tesorero*, 72 D.P.R. 698, 706, escolio 10. Como dijimos en 71 D.P.R. a la pág. 304: ". . . [L]as cuestiones constitucionales que se vislumbren en lontananza posiblemente se desvanecerían como resultado de las conclusiones de hecho . . .".

Parece especialmente innecesario especular aquí en cuanto al alcance del caso de *Nelson* en vista de lo siguiente: En primer lugar, hasta donde sepamos, éste es el único caso en que se ha procesado a un comunista bajo la Ley núm. 53. En consecuencia, no parece probable que surja otra vez

dicto de culpabilidad. Por consiguiente, creo que debemos basar nuestra sentencia en ese fundamento más bien que en la teoría de que cuando se le presente, si es que se le presenta, el problema al Tribunal Supremo de los Estados Unidos, éste resolverá que la Ley Smith impide el procesamiento de comunistas bajo la Ley núm. 53.

Toda vez que ésta no es una opinión de la mayoría, no veo fin práctico en analizar en detalle el testimonio en este caso. Sin embargo, creo que debo hacer algunas observaciones generales en relación con la naturaleza de la acusación y la evidencia presentada en un esfuerzo por probarla.

Al acusado *no* se le imputó ser miembro del Partido Comunista, a sabiendas de que éste aboga por el derrocamiento de nuestro gobierno mediante la fuerza y la violencia.[3]

---

este problema constitucional específico. En segundo lugar, una decisión contra el poder de *un estado de la Unión* para intervenir con las actividades subversivas de los comunistas no anularía necesariamente un estatuto penal puertorriqueño que comprenda tales actividades, bien se hubiera aprobado nuestro estatuto (*a*) antes o (*b*) después del 25 de julio de 1952. En cuanto a (*a*), cf. *Puerto Rico* v. *Shell Co.*, 302 U. S. 253, 271; *Irizarry* v. *Corte*, 64 D.P.R. 94, 99–100; *Ballester Hnos.* v. *Tribunal de Contribuciones*, 66 D.P.R. 560, 578, escolio 17, revocado por otros fundamentos, 162 F.2d 805 (C.A. 1, 1947), *certiorari* denegado, 332 U. S. 816; *Pueblo* v. *Burgos*, 75 D.P.R. 551, 561–64, y casos citados; *Postley* v. *Secretario de Hacienda*, 75 D.P.R. 874, 897. En cuanto a (*b*), cf. *González* v. *Tribunal Superior*, 75 D.P.R. 585, 608; *Carrión* v. *González*, supra; *Pueblo* v. *Figueroa*, 77 D.P.R. 188, confirmado en 232 F.2d 615 (C.A. 1, 1956), y casos citados en ambas opiniones; *Junta Relaciones del Trabajo* v. *Ortega*, págs. 760, 765 de este tomo, escolio 4.

[3] Esta acusación no se le podía formular: la Ley núm. 53 no fué enmendada en el sentido de que fuera delito el pertenecer en tal forma al partido hasta después de haberse cometido el supuesto delito en este caso en o antes del 30 de octubre de 1950. Ley núm. 53, Leyes de Puerto Rico, 1948, Sexta, Séptima y Octava Legislaturas Extraordinarias, según fué enmendada por la Ley núm. 13 del 20 de diciembre de 1950, Leyes de Puerto Rico, Quinta a la Duodécima Legislaturas Extraordinarias, 1950–51; 33 L.P.R.A. sec. 1471.

Una acusación de pertenecer al Partido Comunista, conociendo los objetivos de dicho partido, bajo la Ley núm. 53, según fué enmendada por la Ley núm. 13 del 20 de diciembre de 1950, levantaría—en adición a la cuestión de supremacía, véase el escolio 1—cuestiones constitucionales que están pendientes de decisión ante el Tribunal Supremo de los Estados Unidos. *Scales* v. *United States*, 227 F.2d 581 (C.A. 4, 1955), *certiorari* expedido, 250 U. S. 992; *United States* v. *Lightfoot*, 228 F.2d 861 (C.A.

Ésta *no* es una acusación de conspiración; el apelante fué acusado *solo* de abogar por el derrocamiento del gobierno mediante fuerza y violencia. ([4]) Por tanto, era necesario que el gobierno probara, fuera de duda razonable, que el acusado personalmente abogó por el derrocamiento del gobierno mediante fuerza y violencia según se define esto restrictivamente en el caso de *Dennis*. ([5]) Además, bajo la acusación en este caso, las actuaciones, la conducta y las exhortaciones de otros comunistas o nacionalistas no eran admisibles en evidencia contra el acusado, en ausencia de prueba que lo conecte con aquéllas.

He examinado los autos y estoy convencido de que no contienen testimonio alguno que demuestre que el acusado *personalmente* abogó por la fuerza y la violencia *en la forma*

7, 1956), *certiorari* expedido, 350 U. S. 992. Los argumentos orales en los casos de *Scales* y *Lightfoot* ante el Tribunal Supremo aparecen sintetizados en U.S.L. Week 3109–11 (16 de octubre de 1956).

([4]) El apelante fué acusado de infringir solamente el inciso 1 del art. 1 de la Ley núm. 53. Véase *Pueblo* v. *Burgos,* supra, 556, 565, escolio 11.

([5]) La Ley núm. 53 es sustancialmente similar a la Ley Smith. *Pueblo* v. *Reynolds*, 77 D.P.R. 446, 454, escolio 7; *Pueblo* v. *Burgos*, supra. Y la Ley núm. 53 debe confrontarse con el mismo análisis constitucional con que se confrontó la Ley Smith. *Cf.* Antieau, *The Rule of Clear and Present Danger: Scope of its Applicability*, 48 Mich.L.Rev. 811, 816–20. A ese respecto, a nuestros fines, existen dos puntos importantes. Primero, un elemento esencial de tal delito es "...*la prueba de la intención....*de derrocar el gobierno por medio de fuerza y violencia." *Dennis* v. *United States*, 341 U. S. 494, 499, 512 (bastardillas nuestras); *Pueblo* v. *Burgos*, supra, págs. 565–66. Segundo, la doctrina de "peligro claro e inminente" significa en este contexto que el Pueblo viene obligado a probar que el acusado tuvo la intención de causar el derrocamiento del gobierno tan pronto como las circunstancias lo permitieran, *Dennis* v. *United States,* supra, págs. 509–11; o, dicho de otro modo en el lenguaje usado por el Juez Presidente Learned Hand en la Corte de Apelaciones, según lo cita con aprobación la Corte Suprema en el caso de *Dennis* a la pág. 510: "En cada caso [los tribunales] deben inquirir si la gravedad del 'mal', aminorada por su improbabilidad, justifica tal invasión de la libertad de expresión como sea necesaria para evitar el peligro."

Véanse Auerbach, *The Communist Control Act of 1954: a Proposed Legal-Political Theory of Free Speech*, 23 U.Chi. L.Rev. 173, 185–204; Richardson, *Freedom of Expression and the Function of Courts*, 65 Harv. L.Rev. 1, 8; *The Communist Control Act of 1954*, 64 Yale L.J. 712, 728; *Guadalupe* v. *Bravo, Alcaide Cárcel,* 71 D.P.R. 975, 981, escolio 1. *Cf.*

*prescrita en el caso de Dennis,* véase el escolio 5. En verdad, hubo muy poca prueba con respecto a las propias manifestaciones y actuaciones del acusado; y ninguna de sus exhortaciones, no importa cuánto podamos disentir de ellas, alcanza el nivel de la clase de prueba que en el caso de *Dennis* se describe como necesaria para una convicción bajo la acusación que está ahora ante nos. Los autos sí constan de cientos de páginas de evidencia—admitida con la objeción del acusado —que describe detalladamente varios actos de violencia en que participaron nacionalistas el 30 de octubre de 1950. (⁶) Pero en mi opinión ninguna de esta prueba era admisible contra el acusado, toda vez que los autos están huérfa-

Rostow, *The Democratic Character of Judicial Review,* 66 Harv.L.Rev. 193, 216–23; Mendelson, *Clear and Present Danger—From Schenck to Dennis,* 52 Col.L.Rev. 313, 330–31; *Schneiderman* v. *United States,* 320 U. S. 118, a las págs. 157–58, como lo discute el Juez Learned Hand en el caso de *Dennis,* 183 F.2d a la pág. 211.

Los dos puntos anteriores son suscitados en la opinión de pluralidad escrita por el Juez Presidente Sr. Vinson y en la que concurrieron tres jueces asociados en el caso de *Dennis.* La opinión concurrente del Juez Asociado Sr. Frankfurter, a nuestros fines, no fija una norma diferente. Véase, *The Supreme Court, 1950 Term,* 65 Harv.L.Rev. 107, 129–31. Además, la opinión de pluralidad ha sido seguida por todas las Cortes de Apelaciones de Circuito que han considerado la cuestión. *United States* v. *Dennis,* 183 F.2d 201 (C.A. 2, 1950), confirmado, 341 U. S. 494; *Frankfeld* v. *United* States, 198 F.2d 679 (C.A. 4, 1952), *certiorari* denegado, 344 U. S. 922; *United States* v. *Flynn,* 216 F.2d 354 (C.A. 2, 1954), *certiorari* denegado, 348 U. S. 909; *United States* v. *Schneiderman,* 106 F.Supp. 906 (U. S. Dist.Ct., Cal., 1952), confirmado en *Yates* v. *United States,* 225 F.2d 146 (C.A. 9, 1955), *certiorari* expedido, 350 U. S. 860; *United States* v. *Mesarosh,* 223 F.2d 449 (C.A. 3, 1955), *certiorari* expedido, 350 U. S. 922, sentencia revocada, *Mesarosh* v. *United States,* 352 U. S. 1 y 832, 25 U.S.L. Week 3113 (10 de octubre de 1956); *Wellman* v. *United States,* 227 F.2d 757 (C.A. 6, 1955). Por consiguiente, creo que estamos compelidos a seguir el lenguaje del Juez Presidente Vinson sobre estos dos puntos, como cuestión del debido procedimiento federal. Y el resultado a que llego en cuanto a los hechos en este caso hace innecesario que pase sobre los derechos del acusado bajo la Constitución del Estado Libre Asociado.

(⁶) Tomamos conocimiento judicial de la proposición general al efecto de que en Puerto Rico hubo una "revuelta" nacionalista el 30 de octubre de 1950. *Guadalupe* v. *Bravo, Alcaide Cárcel,* supra, 980, 988. Véanse *Cruz Vélez* v. *Liverpool & London & Globe Insurance Co.,* pág. 722 de este tomo, resuelto el 23 de noviembre de 1956; *Home Ins. Co. of New York* v. *Dávila,* 212 F.2d 731, 733–35 (C.A. 1, 1954); *Albizu* v. *United States,*

nos de evidencia que lo conecte personalmente con estos actos de violencia. Indudablemente, el acusado simpatizaba con estos actos de violencia y expresó su aprobación de los mismos mientras ocurrían y después de ocurridos.(⁷) Esto era reprochable y detestable por el pacífico pueblo de Puerto Rico. Pero tales simpatías y aprobación, por sí solas, no constituyen el abogamiento del derrocamiento del gobierno mediante fuerza y violencia, según lo prohibe la Ley núm. 53, que como hemos visto debe interpretarse restrictivamente según se establece en el caso de *Dennis*, véase escolio 5. *Pueblo v. Reynolds*, supra.(⁸)

 El tribunal sentenciador permitió que un sargento de la policía—basado en su manifestación de que había leído

88 F.2d 138 (C.A. 1, 1937), *certiorari* denegado, 301 U. S. 707. Pero era necesario presentar prueba que los implicara personalmente a fin de obtener la convicción de nacionalistas específicos bien sea de delitos de violencia o bajo la Ley núm. 53. *Pueblo* v. *Reynolds*, supra; *Pueblo* v. *Burgos*, supra; *Pueblo* v. *Hernández*, 77 D.P.R. 464, 469, 470, escolio 3. *A fortiori*, tal prueba era necesaria en el caso de autos contra el acusado, un comunista.

(⁷) En los autos no hay evidencia sustancial que demuestre conexión alguna entre las actividades de los nacionalistas y de los comunistas en Puerto Rico. Tampoco tenemos ante nos nada que demuestre acción y abogamiento coordinados y prohibidos entre los dos partidos, en o antes del 30 de octubre de 1950, ni en ninguna otra fecha. Indudablemente había una simpatía mutua entre los dos partidos en cuanto a los objetivos del Partido Nacionalista. Pero aquí, nuevamente, esto no era suficiente para que en el caso ante nos fueran admisibles en evidencia los detalles de la "revuelta" nacionalista de 1950, en ausencia de prueba que implicara al acusado *personalmente* al abogar por o realizar estos actos de violencia.

(⁸) Luego de indicar en el caso de *Reynolds* que el inciso 1 del art. 1 de la Ley núm. 53 prohibe (pág. 456) "la propaganda subversiva por medio de la palabra hablada" que inste a la acción, este Tribunal usó lenguaje a la pág. 457, que creo es igualmente aplicable a este caso:

"Quizás el fiscal tendría razón si los apelantes hubieran sido acusados y convictos de pertenecer o estar afiliados a una sociedad subversiva a sabiendas de su propósito, o de una conspiración para cometer los distintos actos prohibidos por la Ley 53. Sin embargo bajo la acusación formulada a los apelantes el Pueblo venía obligado a aprobar que ellos fomentaron, abogaron, aconsejaron o predicaron, algo que la ley prohibe, o sea, la necesidad, deseabilidad y conveniencia de derrocar, paralizar o destruir el Gobierno de Puerto Rico por medio de la fuerza o la violencia. Ni el juramento prestado por la Reynolds ni su afiliación al Partido Nacionalista, ni su asistencia a los distintos actos celebrados por

algunos libros de Marx y de Lenín—diera su abarcadora opinión de que los comunistas en Puerto Rico abogan por el derrocamiento del gobierno mediante fuerza y violencia. No me detengo a determinar si esta opinión del sargento era admisible en evidencia. Sólo observo que los libros en que descansaba no fueron presentados en evidencia. Más importante, no hubo prueba de que el acusado los utilizó en el abogamiento que aquí se le imputa. En verdad, nada surge de los autos que indique que el acusado había leído estos libros o tan siquiera los había oído mencionar. (⁹) Existe un marcado contraste entre esto y la evidencia cuidadosa, detallada y sistemática presentada por el Gobierno de los Estados Unidos en todos los casos de la Ley Smith que he podido hallar. En esos casos los libros envueltos no sólo fueron presentados en evidencia, sino que se estableció mediante abundante prueba que el acusado los había leído y los *utilizó* al abogar por el derrocamiento del Gobierno por medio de fuerza y violencia. Véanse los casos citados en el último párrafo del escolio 5, y *Mesarosh* v. *United States*, 352 U. S. 1, 10, escolio 5 (5 de noviembre de 1956). En el caso de autos ninguna evidencia de esta clase fué presentada. (¹⁰)

---

dicha agrupación pueden clasificarse como actos delictivos bajo el inciso 1 que comentamos de la Ley 53. Si las actividades a que se han dedicado los apelantes constituyen o no algún otro delito bajo la Ley 53, es cuestión que no estamos resolviendo ahora. Nuestra decisión está limitada a los hechos que presenta el récord de este caso. Tales hechos, repetimos, no constituyen el delito imputado a los apelantes."

El mismo razonamiento se aplica a la asistencia del acusado a mítines comunistas y a sus aplausos de manifestaciones en ellos vertidas, aun cuando se suponga, sin decidirse, que las manifestaciones hechas en los mítines que surgen de los autos estaban prohibidas por la Ley núm. 53, según la circunscribe el caso de *Dennis*.

(⁹) La prueba sí demuestra que el acusado distribuyó ejemplares de "Verdad", periódico oficial del Partido Comunista en Puerto Rico, y un folleto titulado "El Grito de Lares y la Actualidad Puertorriqueña", escrito por César Andréu Iglesias. Nada encuentro en ellos que cumpla con la norma del caso de *Dennis*, véase escolio 5.

(¹⁰) Hablando en términos generales, podemos tomar conocimiento judicial de las actividades en todas partes del mundo del movimiento comunista y de sus objetivos. *United States* v. *Dennis*, 341 U. S. a las págs. 510–11; *Communications Assn.* v. *Douds*, 339 U. S. 382, 424 *et seq.*, opinión

"Los Jueces no viven en un vacío. Sabemos lo que el resto de la comunidad sabe."[11] Me doy cuenta de que el comunismo es una conspiración criminal internacional que amenaza el sistema de vida democrático en el mundo libre en todos los frentes—el internacional, el nacional y el local. Véase el escolio 10, al cual deben sumarse los recientes sucesos de Hungría. Pero "...la esencia de las instituciones de la libertad demanda que se reconozca que la culpabilidad atañe a la persona y aquélla no puede basarse en sus creencias...".[12] El gobierno—*bajo la acusación formulada en este caso*—venía obligado a probar, fuera de duda razonable, que el acusado personalmente abogaba por actos con los cuales tuvo la intención específica de y que fueron razonablemente calculados para derrocar el Gobierno tan pronto como las circunstancias lo permitieran. *Dennis* v. *United States*, supra, según se discute en el escolio 5. No puedo convenir en que la evidencia en este caso sostiene tal acusación contra el apelante.[13]

---

del Juez Sr. Jackson; *United States* v. *Dennis*, 183 F.2d 201, 213 (C.A. 2, 1950); *United States* v. *Flynn*, supra, 367, escolio 9; *United States* v. *Schneiderman*, 106 F.Supp. a la pág. 922, y casos citados; Nota, *Federal Anti-Subversive Legislation of 1954*, 55 Col.L.Rev. 631, 711, escolio 616. Pero repetimos una vez más que bajo la acusación que está ante nos debe haber alguna evidencia que demuestre que el acusado abogaba personalmente, según esto se define en el caso de *Dennis*, véase el escolio 5. Según indica Richardson, supra, pág. 11: "Independientemente de si las circunstancias concurrentes hacen que la probabilidad existente del mal que se vislumbra sea grande o pequeña, *evidencia de que la manifestación en cuestión contribuyó en algo* hacia el aumento de tal probabilidad, parece ser esencial." (Bastardillas nuestras.)

[11] *Suárez* v. *Tugwell, Gobernador*, 67 D.P.R. 180, 188. Véase además, *Ballester* v. *Tribunal de Apelación*, 61 D.P.R. 474, en el que dijimos a las págs. 507-08: "Sin embargo, nuestro papel, aunque limitado, no se desarrolla en un vacío. Cuando los hechos son suficientemente abrumadores, hasta los tribunales pueden tomar conocimiento judicial de los mismos, y de ese modo evitar en parte la censura expresada por Bentham al efecto de que el arte de la jurisprudencia consiste en desconocer metódicamente lo que todo el mundo sabe."

[12] El Juez Presidente Sr. Hughes, citado en *Schneiderman* v. *United States*, 320 U.S. 118, 154, escolio 41.

[13] Como dijo el Juez Presidente Warren, hablando por el Tribunal, hace poco en otro contexto: "El Gobierno de una nación poderosa y libre

Por los motivos expuestos, concurrí en la revocación de la sentencia y en la absolución del acusado.

---

Opinión emitida por el Juez Asociado Señor Sifre, en la cual concurre el Juez Asociado Señor Saldaña.

14 de diciembre de 1956.

██ El apelante fué convicto de infracción a la Ley núm. 53 de 10 de junio de 1948, según fué enmendada posteriormente.(¹) Apeló de la sentencia que se dictó en su contra, y estando pendiente de apelación presentó un alegato adicional sosteniendo que procedía su absolución, ya que en vista de lo resuelto por la Corte Suprema de los Estados Unidos en *Pennsylvania* v. *Nelson*, 350 U.S. 497, "El Pueblo de Puerto Rico carecía de autoridad para poner en vigor la Ley 53, ... , por cuanto el Gobierno Federal había ocupado el campo de la sedición y actos subversivos mediante legislación punitiva de tal conducta", aludiendo a la Ley Smith, 18 U.S.C. sec. 2385, que proscribe conducta sediciosa contra

---

no necesita convicciones basadas en prueba de esta clase. No puede permitir que exis`an. Los intereses de la Justicia demandan la revocación de las sentencias...". *Mesarosh* v. *United States*, supra, 14, pág. 12 del alcance de la opinión.

(¹) La Ley núm. 53, según estaba en vigor cuando ocurrieron los hechos que dieron lugar al proceso, en lo pertinente, leía así: "Artículo 1.—(*a*) Constituirá delito grave (*felony*) castigable con pena de presidio de uno (1) a diez (10) años la comisión por cualquier persona de cualquiera de los siguientes actos: 1.—fomentar, abogar, aconsejar o predicar, voluntariamente o a sabiendas la necesidad, deseabilidad o conveniencia de derrocar, paralizar o destruir el gobierno insular, o cualquier subdivisión política de éste, por medio de la fuerza o la violencia; 2.—imprimir, publicar, editar, circular, vender, distribuir o públicamente exhibir, con la intención de derrocar, paralizar o destruir el Gobierno Insular o cualquiera de sus divisiones políticas, cualquier escrito o publicación donde se fomente, abogue, aconseje o prediqué la necesidad, deseabilidad o conveniencia de derrocar, paralizar o destruir el Gobierno Insular o cualquier subdivisión política de éste, por medio de la fuerza o la violencia; 3.—organizar o ayudar a organizar cualquier sociedad, grupo o asamblea de personas que fomenten, aboguen, aconsejen o prediquen la derrocación o destrucción del gobierno insular, o de cualquier subdivisión política de éste, por medio de la fuerza o la violencia."

el "gobierno de los Estados Unidos o el Gobierno de cualquier Estado, Territorio, Distrito o Posesión...". La sentencia fué revocada por mayoría, resultado con el que estuve de acuerdo porque, aun cuando no puedo estar conforme con que la Asamblea Legislativa de Puerto Rico estaba desprovista de poder para aprobar la Ley 53, según asevera erróneamente el apelante, sí soy de opinión que en virtud de la decisión en el caso de *Nelson*, las actividades que sirvieron de base a la convicción del procesado en el caso de autos, de constituir delito, estaban fuera de la órbita de la citada ley y dentro del campo de la sedición en el que la jurisdicción federal es exclusiva.

He llegado a la conclusión anterior a sabiendas de que la cuestión revisada en *Pennsylvania* v. *Nelson*, supra, fué la decisión del Tribunal Supremo de Pennsylvania anulando la convicción de Nelson por conducta subversiva *contra el gobierno nacional, bajo la Ley de Sedición de dicho Estado, que prohibía tanto actos subversivos contra el Gobierno de los Estados Unidos, como actos subversivos contra el gobierno local, Commonwealth* v. *Nelson*, 377 Pa. 58; 104 A.2d 133; y consciente de que la Corte Suprema hizo constar en su opinión que "todo lo que está ante nos para revisión, es que la Ley Smith de 1940, según fué enmendada en 1948, que prohibe fomentar a sabiendas el derrocamiento del gobierno de los Estados Unidos por medio de la fuerza y la violencia, excluye la aplicación de la Ley de Sedición de Pennsylvania que prohibe la misma conducta". A pesar de ello, las razones que sirvieron de fundamento a la decisión en el caso de *Nelson*, son a mi juicio, aplicables tanto a un proceso incoado en un Tribunal de un Estado, Territorio, etc., por actos subversivos contra el Gobierno de los Estados Unidos, como a un proceso por actos subversivos imputados como constitutivos de delito contra el gobierno local, si tales actos por su naturaleza o carácter están en efecto en el área de la sedición cubierta por la legislación congresional a que aludió la Corte Suprema. Véase *Commonwealth* v. *Gilbert*, 134 N.E.2d 12.

Expuso dicha Corte que "Cuando, como en el caso presente, el Congreso no ha dicho específicamente si un estatuto federal ha ocupado el campo en el que los Estados tienen de otro modo libertad para legislar, diversos criterios han ofrecido la clave para llegar a una decisión". Encontró que "cada uno de los criterios de exclusión", estaba presente, a saber, (1) el plan de reglamentación federal, por lo penetrante, implica que el Congreso no ha dejado lugar a los Estados para complementarlo. Identificó dicho plan aludiendo a la Ley Smith, a las disposiciones generales sobre conspiración criminal, 18 U.S.C. sec. 371, al *Internal Security Act* de 1950, 50 U.S.C. sec. 781 et seq., y al *Communist Control Act* de 1954, 50 U.S.C. sec. 841 et seq., en el que se declara "que el Partido Comunista de los Estados Unidos, aunque aparentemente un partido político, es en efecto una instrumentalidad de una conspiración para derrocar el Gobierno de los Estados Unidos", y que "su papel como agencia de una potencia hostil extranjera hace que su existencia constituya un peligro, claro, presente y continuo para la seguridad de los Estados Unidos"; (2) los estatutos federales tocan un campo en el que el interés federal es tan predominante que tiene que suponerse que el programa federal excluye la ejecución de las leyes estatales sobre el mismo asunto. Con respecto a ello dijo la corte que "El Congreso ha ideado un programa abarcador para ofrecer resistencia a las diversas formas de agresión totalitaria", añadiendo que mediante ese programa, "Nuestras defensas externas han sido fortalecidas, y se ha diseñado un plan para dar protección contra actos subversivos internos. ... Ha asignado vastas sumas, no solamente para nuestra protección, sí que también para fortalecer la libertad en todo el mundo. Ha encargado al *Federal Bureau of Investigation* y a la *Central Intelligence Agency* la responsabilidad de indagar con respecto a actividades comunistas de tipo sedicioso en contra de nuestro Gobierno, y ha considerado tales actividades como parte de una

conspiración mundial. Consecuentemente proscribió la sedición contra todo gobierno, nacional, estatal o local". "El Congreso", también manifestó la Corte Suprema, "declaró que se daban esos pasos 'para proveer para la defensa común, para preservar la soberanía de los Estados Unidos como nación independiente, y garantizar a cada Estado una forma republicana de gobierno'"; y por último, (3), el "serio peligro de conflicto con la administración del programa federal", que se describe en la opinión.

A Deusdedit Marrero Nazario se le procesó, porque *"allá en o alrededor del día 30 de octubre de 1950 y con anterioridad a dicha fecha, antes de la radicación de esta acusación,* y en la Municipalidad de Arecibo . . . . , ilegal, maliciosa, criminal, voluntariamente y a sabiendas, siendo un comunista activo, . . . hizo manifestaciones y propaganda a distintos grupos, de personas en las cuales fomentó, abogó, aconsejó y predicó la necesidad, deseabilidad y conveniencia de derrocar, paralizar y destruir el Gobierno Insular de Puerto Rico y las subdivisiones políticas de éste por medio de la fuerza y de la violencia, *todo ello realizado por el aquí acusado, en momentos en que se desarrollaba . . . una revuelta impulsada por miembros de una agrupación denominada 'Partido Nacionalista de Puerto Rico', encaminada dicha revuelta a conseguir la separación de Puerto Rico de los Estados Unidos por medio de la fuerza y la violencia".* (Bastardillas nuestras.) Como se habrá notado, el ministerio público no se limitó a imputar al apelante el haber fomentado, abogado, aconsejado y predicado "la necesidad, deseabilidad y conveniencia de derrocar, paralizar y destruir el Gobierno Insular de Puerto Rico . . . ", el día 30 de octubre de 1950. También se le acusó de haber realizado esos actos con antelación a dicha fecha.

Los autos ponen de manifiesto la evidencia presentada y sometida al jurado por El Pueblo para sostener las alegaciones de la acusación. El Fiscal adujo prueba para demos-

trar que en el año 1942 el procesado era un comunista activo, miembro del Partido Comunista de Puerto Rico, y que desde entonces tomó parte en las actividades de dicho Partido, abogando en diversas ocasiones y en distintos sitios, por el derrocamiento del gobierno local y por la separación de Puerto Rico de los Estados Unidos "en cualquier forma que fuera" como medio para establecer aquí el régimen comunista. Uno de los testigos del ministerio público manifestó que en una asamblea celebrada por el Partido Comunista en el año 1946, a la que asistió el apelante como delegado de la Sección Comunista de Caguas, dicho Partido se decidió por la independencia de Puerto Rico y resolvió propulsar los principios Marxistas-Leninistas y los principios y las doctrinas revolucionarias, como eran propulsadas por el Partido Comunista de Rusia, con el que estaba entrelazado el movimiento comunista local. (²) Depuso ese mismo testigo que "los partidos comunistas en el mundo no limitan sus operaciones al país o al sitio o al estado donde se llevan a cabo sus funciones, sino que es un movimiento internacional", que "La teoría comunista descarta la posibilidad de que se pueda establecer la república del proletariado, o sea, implantar el tipo de gobierno comunista sin que primero se haya eliminado la clase capitalista, y siendo ésa la primera fase del movimiento para destruir el capital, que es la fuerza representada por el Estado, primero hay que destruir la maquinaria del Estado para que no haya antagonismos; entonces no existiendo la maquinaria del Estado, se establece inmediatamente la dictadura del pro-

---

(²) El Pueblo presentó prueba al efecto de que en un mitin celebrado por el Partido Comunista de Puerto Rico en el año 1948 habló William Foster, Presidente del Partido Comunista de los Estados Unidos, diciendo, entre otras cosas, que éste ofrecía toda su cooperación a los comunistas de Puerto Rico. También se presentó evidencia para demostrar que en ese mitin, Juan Santos Rivera, entonces Secretario del Partido Comunista de Puerto Rico, manifestó "que el imperialismo de los Estados Unidos había impedido que el Dr. Marinelo de Cuba, visitara a Puerto Rico; que no obstante eso ellos tenían una grabación del discurso que habría de pronunciar Marinelo ... "; que "El Dr. Marinelo es cubano y está identificado con el movimiento comunista mundial".

letariado y eso se logra mediante la revolución, la lucha, revolución "violenta", lucha "armada". Asimismo declaró que según el "Partido Comunista Puertorriqueño" es imposible "crear, estructurar la república de Puerto Rico sin que antes haya la revolución de tipo combativo y violento". Preguntado si sería posible implantar en la Isla el tipo de gobierno por el que abogan los comunistas de Puerto Rico, "manteniendo los vínculos que existen hoy en día con los Estados Unidos de América", contestó en la negativa.

En cuanto a los sucesos del 30 de octubre de 1950, el propio Fiscal se encarga de darnos todo lo que reveló la prueba con respecto al apelante. Paso a copiar de su alegato: "El 30 de octubre de 1950 se encontraba en la Oficina de Bienestar Público de Arecibo, donde trabajaba y aprovechaba toda oportunidad para elogiar el ideal comunista y menospreciar el sistema de gobierno imperante en nuestra Isla. (T. E. 210–212, 265, etc.) Allí alardeaba de su condición de comunista, hacía el saludo correspondiente (T.E. 213, 257) y afirmaba que debería quitarse el gobierno actual para imponer un gobierno comunista (T.E. 212). Cuando en las proximidades de esa oficina un grupo de nacionalistas atacaba el cuartel de la policía y se batía a tiros con ésta, manifestó que "hoy es que me siento verdaderamente orgulloso de ser puertorriqueño" (T.E. 217, 261), refiriéndose a que "estaban atacando el Cuartel y habían matado policías y ésa era la forma de quitar el Gobierno" (T.E. 217). Insistía que, "eso que estaban haciendo allí era lo que se debía hacer" (T.E. 219). Regocijadamente expresaba que ésa era "la mejor forma de tumbar el gobierno" (T.E. 260)."

Me he referido en términos generales a la evidencia que se presentó al jurado, con el único propósito de poner de manifiesto que al procesado en efecto se le condenó por su asociación con el Partido Comunista y por sus antecedentes y actividades comunistas.

No he aludido a ella como base para discutir si fué o no suficiente para probar que Marrero Nazario fomentó, abogó,

aconsejó y predicó la necesidad, deseabilidad y conveniencia de derrocar, paralizar y destruir el Gobierno de Puerto Rico y sus subdivisiones políticas por medio de la fuerza, en violación de las disposiciones de la Ley 53. Lo he hecho para poner de manifiesto que al apelante se le juzgó y condenó sin autoridad legal, por actos que de haber sido subversivos y constituir delito, cuestión acerca de la cual no estoy expresando criterio alguno, estaban en el área de la sedición en la que es exclusiva la jurisdicción federal, según leo la opinión en el caso de *Nelson*, por tratarse de actos sediciosos comunistas. Actividades de ese carácter representan un peligro para la supervivencia de *toda la nación*, aun cuando vayan dirigidas contra determinado gobierno local. Constituyen un problema de carácter nacional y así lo ha considerado y tratado el Congreso, el que ha concedido al gobierno federal autoridad amplia y suficiente para protegerse a sí mismo contra tales actividades y para igualmente proteger a los Estados, Territorios, etc.

He dado mi atención a lo que es fundamental en el caso de autos. Al hecho de que el apelante fué convicto, según he dicho, sin autoridad de ley, cuestión que a mi entender no puede rehuirse.

La conclusión anterior no significa que Puerto Rico no pueda defenderse contra actos subversivos. Nuestra Asamblea Legislativa, reitero, podía aprobar la Ley 53, para ser de aplicación a actos sediciosos no incluídos en el área de la sedición ocupada con exclusividad por el gobierno federal. Ya tendré ocasión de exponer mi opinión en otro caso que está bajo la consideración del Tribunal, en cuanto a la conducta sediciosa que está en la órbita de dicha ley.

No estoy de acuerdo con el criterio expresado por el Juez Asociado, Sr. Negrón Fernández, en su opinión disidente, en el sentido de que el caso de *Nelson* es inaplicable al de autos por las circunstancias que apunta en dicha opinión, criterio que se funda, a mi juicio, en premisas que no están sostenidas por la prueba. Reafirmo que ésta demuestra que el acusado

fué convicto por actividades comunistas a las que se dedicó durante varios años antes de octubre 30 de 1950 y acerca de las cuales presentó prueba El Pueblo, que fué considerada por el jurado. (³) Lo que hizo ese día el procesado, con motivo de los sucesos provocados por miembros del Partido Nacionalista, aparece reseñado por el Fiscal en la forma ya expuesta. Difícilmente hay en ello justificación para estas conclusiones del Juez Asociado Sr. Negrón Fernández: "Si en este caso no se hubiera alegado ni se hubiere probado que hechos de tal naturaleza ocurrieron mientras estaba en marcha una revuelta nacionalista, en la que se usaba la fuerza y la violencia para derrocar el Gobierno Insular, yo hubiera estado inclinado a convenir en que bajo la decisión de *Pennsylvania* v. *Nelson*, supra, la jurisdicción para procesar y juzgar al aquí apelante podía haber correspondido exclusivamente a la Corte de Distrito de los Estados Unidos para Puerto Rico. Pero bajo las alegaciones y los hechos de este caso, él fué, a mi juicio, propiamente juzgado por el tribunal de instancia. El apelante—que admitió en su propio testimonio al declarar en el tribunal a quo que era un comunista activo y que hacía propaganda comunista desde hacía muchos años—aprovechó el momento en que se desarrollaba en toda

---

(³) Transcribo lo siguiente del alegato presentado por el Fiscal:

"Se ofreció prueba abundante, asimismo, de la naturaleza de la campaña conducida por el Partido Comunista en Puerto Rico y en particular, de su filosofía política, según predicada por sus más altos líderes en los distintos actos públicos a que asistió el acusado. Se sustentó siempre en esas actividades que el partido en el poder, el gobierno constituído en Puerto Rico, hay que terminarlo, tumbarlo y derrocarlo en cualquier forma y de cualquier manera (T.E. 106–108, 110–111, 148, 152, 162, 177, 200, 401); que la clase trabajadora tenía que 'rebelarse contra ese gobierno para terminar para siempre con él y así levantar el Partido Comunista' (T.E. 109), el que por lo menos podía contar, según se dijo (T.E. 399), con el apoyo del Partido Nacionalista de Puerto Rico.

"Se evidenció, además, que el Partido Comunista propulsa en Puerto Rico las teorías Marxistas y Leninistas, según sostenidas por el Partido Comunista de Rusia (T.E. 388), las que encierran una doctrina de tipo revolucionario internacional (T.E. 406–408), con el que se entrelaza el movimiento en Puerto Rico al través de la Internacional Comunista (T.E.409)."

su plenitud la revuelta armada de los nacionalistas, para abogar con su palabra por el derrocamiento del Gobierno Insular por medio de la fuerza y la violencia. Tales prédicas constituían una fuerza coactiva e incitadora para la continuación de la revuelta ya en marcha, encaminada al derrocamiento del Gobierno Insular por los medios violentos que se estaban empleando en ese mismo instante. En tal situación, no importa que su prédica obedeciera a los objetivos de la conspiración comunista, su actividad dejó de ser un factor aislado para tornarse en ingrediente activo de la conspiración en proceso de desarrollo incitando al objetivo inmediato de ésta, en plena ejecución."

La "actividad" de Marrero Nazario en 30 de octubre de 1950 consistió de las manifestaciones—ya transcritas—hechas mientras estaba en la oficina a compañeros de trabajo. Aunque tales manifestaciones son en extremo reprobables, no puedo convenir con que se convirtieron en ingrediente de la conspiración Nacionalista. No se presentó prueba de que el apelante participara en dicha conspiración ni antes ni durante su desarrollo.

Este caso surgió mientras estaba en vigor la Carta Orgánica de 1917. No está envuelta cuestión alguna relacionada con los poderes legislativos de Puerto Rico bajo su nuevo *status* de Estado Libre Asociado, y nada de lo que expongo sobre la Ley Smith y la Ley 53, se refiere a tales leyes a la luz de ese nuevo *status*.

---

Opinión emitida por el Juez Asociado Señor Saldaña.
14 de diciembre de 1956.

Aunque estoy conforme con la opinión del Juez Asociado, Sr. Sifre, deseo además destacar el siguiente punto: como la Ley núm. 53 de 10 de junio de 1948 es inaplicable a los actos que se le imputaron al acusado y que sirvieron de base a su convicción, resulta innecesario resolver aquí el gravísimo problema planteado por la *"transformación"* o *"reinterpretación"*

del principio constitucional sobre el peligro claro y actual (*clear and present danger*) que se adoptó en la opinión emitida por una pluralidad de jueces en *Dennis* v. *United States*, 341 U. S. 494 (1951). Al eliminar el requisito de "presente" o "inminente" cuando el peligro que se trata de prevenir es muy grave, se destruye el elemento de la *proximidad* que es la médula de la regla ortodoxa sobre el peligro claro y actual. Véase la opinión disidente del Juez Asociado Sr. Douglas, en *Dennis* v. *United States*, supra, 581, 587–591. Y de ese modo, las cortes en realidad abdicarían su control sobre las decisiones legislativas respecto a las limitaciones del derecho de libertad de palabra y de prensa impuestas por los estatutos relativos al delito de sedición. Véanse Rostow, *The Democratic Character of Judicial Review*, 66 Harv. L. Rev. 193, 217–224 (1952); Chafee, *The Blessings of Liberty* (1956) 85. Cf. Richardson, *Freedom of Expression and the Courts*, 65 Harv. L. Rev. 1 (1951); Mendelson, *Clear and Present Danger-From Schenck to Dennis*, 52 Columbia L. Rev. 315, 330–331 (1952); *Clear and Present Danger Re-examined*, 51 Col. L. Rev. 98, 104–105 (1951). De ahí que este Tribunal, a mi juicio, debe atenerse al principio establecido en *Pennsylvania* v. *Nelson*, 350 U. S. 497 (1956) y así prescindir de otras consideraciones que (expresa o implícitamente) exigen un pronunciamiento sobre los problemas constitucionales señalados. Desde luego, en el caso presente no existe base alguna para resolver si rige o no la regla de *Dennis* bajo la cláusula de la Constitución del Estado Libre Asociado de Puerto Rico que garantiza la libertad de palabra y de prensa.

---

Opinión disidente del Juez Asociado Señor Negrón Fernández, en la cual concurre el Juez Asociado Señor Marrero.

14 de diciembre de 1956.

No estuve conforme con la revocación de la sentencia en este caso y oportunamente consigné mi voto disidente. Habiéndose producido dicha revocación por una mayoría del Tri-

bunal dividida entre sí, exponiéndose en opiniones separadas fundamentos de distinta índole conducentes al mismo resultado, creo oportuno también exponer ahora brevemente las razones en que fundé mi disenso.

Al acusado en este caso se le imputó el que "ilegal, maliciosa, criminal, voluntariamente y a sabiendas, siendo un comunista activo . . . , hizo manifestaciones y propaganda a distintos grupos de personas en las cuales fomentó, abogó, aconsejó y predicó la necesidad, deseabilidad y conveniencia de derrocar, paralizar y destruir el gobierno insular de Puerto Rico y las subdivisiones políticas de éste por medio de la fuerza y la violencia, *todo ello realizado por el aquí acusado en momentos en que se desarrollaba en Puerto Rico una revuelta impulsada por miembros de una agrupación denominada 'Partido Nacionalista de Puerto Rico' encaminada dicha revuelta a conseguir la separación de Puerto Rico de los Estados Unidos por medio de la fuerza y la violencia*". (Bastardillas nuestras.)

No podemos pasar por alto una circunstancia significativa que, a mi juicio, hace inaplicable aquí la decisión en *Pennsylvania* v. *Nelson*, 350 U. S. 497, la cual se invoca para sostener que el delito imputado al apelante está fuera de la órbita de la Ley 53 de 10 de junio de 1948: (1) que los hechos a él imputados—fomentar, abogar, aconsejar y predicar la necesidad, deseabilidad y conveniencia de derrocar, paralizar y destruir el Gobierno Insular de Puerto Rico y las subdivisiones políticas de éste por medio de la fuerza y la violencia—fueron realizados en momentos en que se desarrollaba una revuelta, impulsada por miembros del Partido Nacionalista, encaminada al mismo fin y por los mismos medios.

Si en este caso no se hubiera alegado ni se hubiere probado que hechos de tal naturaleza ocurrieron mientras estaba en marcha una revuelta nacionalista, en la que se usaba la fuerza

---

(1) La Ley núm. 13 de 20 de diciembre de 1950, enmendatoria de la Núm. 53, no es de aplicación por ser posterior a los hechos en que se fundó la acusación.

y la violencia para derrocar el Gobierno Insular, yo hubiera estado inclinado a convenir en que bajo la decisión de *Pennsylvania* v. *Nelson,* supra, la jurisdicción para procesar y juzgar al aquí apelante podía haber correspondido exclusivamente a la Corte de Distrito de los Estados Unidos para Puerto Rico. Pero bajo las alegaciones y los hechos de este caso, él fué, a mi juicio, propiamente juzgado por el tribunal de instancia. El apelante—que admitió en su propio testimonio al declarar en el tribunal a quo que era un comunista activo y que hacía propaganda comunista desde hacía muchos años—aprovechó el momento en que se desarrollaba en toda su plenitud la revuelta armada de los nacionalistas, para abogar con su palabra por el derrocamiento del Gobierno Insular por medio de la fuerza y la violencia. Tales prédicas constituían una fuerza coactiva e incitadora para la continuación de la revuelta ya en marcha, encaminada al derrocamiento del Gobierno Insular por los medios violentos que se estaban empleando en ese mismo instante. En tal situación, no importa que su prédica obedeciera a los objetivos de la conspiración comunista, su actividad dejó de ser un factor aislado para tornarse en ingrediente activo de la conspiración en proceso de desarrollo incitando al objetivo inmediato de ésta, en plena ejecución.

El caso de *Nelson* no puede impedir en este caso, bajo tales circunstancias, el ejercicio de nuestra jurisdicción. Las prédicas del apelante, si bien respondían al objetivo de la conspiración comunista para el derrocamiento de nuestro Gobierno, se integraron a la actividad ostensible de otra conspiración, aunque objetivo no comunista, pero con el mismo fin inmediato.

Independientemente del objetivo a que obedecieran las prédicas del apelante—conspiración comunista para establecer una república de ese tipo mediante el derrocamiento del Gobierno Insular—su actividad se sumó a la otra conspiración —la nacionalista—y en ambas, según quedó establecido por la prueba, *el objetivo común inmediato* era el derrocamiento del gobierno constituído de Puerto Rico por medio de la fuerza y

la violencia. No puede medirse nuestra autoridad para procesar al apelante por infracción a nuestras leyes por la finalidad remota que alentó su prédica cuando hay, como en este caso, una finalidad inmediata que la puso en marcha, aprovechando la oportunidad que otra conspiración, en pleno desarrollo, le ofrecía.

Cualquiera que resulte ser el efecto de la decisión del caso de *Nelson* en la autoridad de los estados de la Unión para perseguir actividades subversivas comunistas dirigidas al derrocamiento de gobiernos estatales, no puede negarse a Puerto Rico, bajo los hechos de este caso, autoridad para proteger su propio gobierno contra el peligro de ese derrocamiento, cuando la propaganda comunista se integra—y no meramente coincide—por su propia e inherente condición subversiva, aprovechando una ocasión propicia, a actividades nacionalistas de fuerza y violencia desatadas en una tentativa ostensible de derrocamiento. Negarle esa autoridad para proteger su propio gobierno contra ese peligro, en las circunstancias peculiares de la realidad puertorriqueña, sería reducirle a la impotencia por postración jurídica y a la vez restar al esfuerzo nacional—en la limitada esfera en que concurriría—un aliado de incalculable valor en su integrada lucha contra la conspiración comunista.

---

Opinión separada del Juez Asociado señor Belaval.
14 de diciembre de 1956.

No estoy conforme con la ilustrada opinión del compañero Juez Asociado Sr. Sifre, en el sentido, que el caso de *Pennsylvania* v. *Nelson*, 350 U. S. 497, nos ha despojado de nuestra facultad en este caso, por haber cubierto el Congreso de los Estados Unidos, el campo de la sedición y actos subversivos mediante legislación a tal efecto. Creo, por el contrario, que debemos aplicar en esta situación de hechos, el caso de *People of Puerto Rico* v. *Shell Company* (*P. R.* ) *Ltd.*, 302 U. S. 253, en el cual se consagró el principio, que a pesar de estar el

campo cubierto por el Congreso de los Estados Unidos, nuestra Asamblea Legislativa podía adoptar un estatuto similar de acuerdo con nuestras realidades locales. Por más que he tratado de razonar el problema, no veo qué conflicto pueda haber en dejar a cada uno de los pueblos, enfocar el comunismo contemporáneo, de acuerdo con sus propias urgencias y peculiaridades. El caso de *Nelson* está resuelto a base de la filosofía práctica de unificar la acción del Gobierno Federal dentro de la peculiar composición de estados semi-soberanos que constituyen la nación norteamericana. Pero no creo que esa filosofía práctica resulte tan sabia cuando se aplica a Puerto Rico. Puede ser que en determinado momento, lo que resulte aconsejable en Estados Unidos, no lo resulte para Puerto Rico y viceversa. Además no me parece prudente en este momento, ante un posible conflicto entre la legislación norteamericana y la nuestra, aplicar el anterior principio de relación federal, que ya—en cuanto a nosotros se refiere—resulta totalmente obsoleto.

En este aspecto, prefiero el enfoque del problema contenido en la opinión del Juez Presidente, Sr. Snyder.